350 So.2d 391 (1977)
INTERNATIONAL RESORTS, INC., et al.
v.
Wesley C. LAMBERT et al.
SC 2121.
Supreme Court of Alabama.
September 30, 1977.
*392 B. Clark Carpenter, Jr. and Barry N. McCrary of Dixon, Wooten, Boyett, McCrary & Thornton, Talladega, for appellants.
Betty C. Love of Love, Love, Lawrence & Burton, Talladega, for appellees.
SHORES, Justice.
This is an appeal from a judgment for the plaintiffs based upon a jury award of $100,000 which was reduced to $50,000 in a remittitur required by the trial court.
Prior to and on July 5, 1971, the defendants, International Resorts, Inc., were the owners and developers of certain real estate known as Point Aquarius which is located on Lake Logan Martin in Talladega County. The development was divided into lots according to a Master Plan prepared by Robert Trent Jones, a golf course architect. This Master Plan was not based upon a survey; however, but rather upon a general rendition of the subdivision. On July 5, 1971, the plaintiffs, Mr. and Mrs. Wesley C. Lambert, Jr., physically inspected the lot marked S-4 with Mr. Johnny Ray and Mr. Bill Beckham, who were representatives of the defendants. The defendants represented to the plaintiffs that this lot was Lot S-4 Golf East (hereinafter Lot S-4) which they had chosen from the Master Plan. The lot was staked with tall white stakes, one of which was marked Lot S-4, and the plaintiffs walked off the lot as presented by the defendants. Thereafter, Mr. Lambert signed an installment sales contract for that lot. Following this, a sign with Mr. Lambert's name on it was placed on Lot S-4.
On July 16, 1971, the defendants mortgaged Lot S-4 to the Commonwealth Financial Corporation. After the plaintiffs were told on August 17, 1971, that the lot was available, they made a down payment of $839.50 according to the contract.
Meanwhile, on July 31, 1971, Mr. and Mrs. Reuel Fick had executed an installment sales contract for the lot designated on the Master Plan as S-9 Golf East.
During the summer of 1972, Moody Ray of the survey firm of Ray, Peoples, and White met with the defendants' project coordinator to determine where to locate the country club parking lot which had not been provided for in the Master Plan. The parking lot was designed in such a manner as to encroach into an area directly adjoining plaintiffs' Lot S-4 and the Ficks' Lot S-9 Golf East. This caused the lots in plaintiffs' area, called Block 4 after the survey, to be shifted northward. The net effect of this shift was that the lot designated S-4 was re-assigned to a location outside Block 4. Although the record is not clear, apparently the plaintiffs were given equity in a lot designated on the Master Plan as J-2 by someone prior to February, 1975. The lot designated J-2 was some distance from the original location of Lot S-4.
In response to their request of July 10, 1972, the plaintiffs received a copy of the original contract. While the record is not clear on this point, either just prior to July 10, or about six months later, the plaintiffs apparently received a notice that their interest, for income tax purposes, was being applied to Lot J-2. The record is clear, however, that the plaintiffs contacted the defendants after the first notice and they were sent a photostatic copy of their original contract. About a year after the plaintiffs received the first notice, they received a similar notice.
The property was surveyed in 1972 or 1973 and the lot originally designed S-4 was re-named by Moody Ray (or by someone in his firm) as Lot 75, Block 4.
*393 Sometime in 1974, Mr. Lambert discovered that the sign with his name on it, which had been placed on Lot S-4, had been removed from the lot.
On February 25, 1975, Mr. Lambert received a telephone call from Mr. Jim Pihakis who informed him there had been a mistake and that Mr. Lambert no longer owned Lot S-4. Thereafter, the plaintiffs traveled to Point Aquarius. When they arrived, they met Mr. Bud Abbott. They inspected their Lot S-4 and discovered that the stakes which had originally been placed on the property had been moved, reducing the size of that original lot. The plaintiffs were also told by Mr. Abbott that they could have Lot J-2 but they could not have their money refunded. When the Lamberts inspected Lot J-2, they found their sign had been placed on it. The plaintiffs were then shown a document that disclosed the lot originally designated S-4 had been deleted and that a smaller lot designated S-9 was now in its place. Further, the plaintiffs were told that Lot S-9 was owned by Mr. Fick. Although the Ficks were re-assigned to a portion of the lot originally designated Lot S-4, now Lot 75 in Block 4, they refused to accept it.
The plaintiffs then filed this action on July 29, 1975, alleging fraud and breach of contract; and, following a judgment in their favor, the defendants appealed, raising, among others, the following issues:
1. That the allegations of fraud and breach of contract are not supported by the evidence;
2. That the statute of limitations bars plaintiffs' action for fraud; and
3. The verdict was excessive.
The first issue presented is whether a prima facie case of fraud was established by the plaintiffs. The relevant portions of plaintiffs' original complaint are as follows:

"COUNT ONE
"1. On or about July 5, 1971, the defendants showed to plaintiffs a certain parcel of land and, along with plaintiffs, stepped off said parcel of land. Defendants represented to plaintiffs that, by entering into an installment sales contract, plaintiffs were purchasing the parcel of land that had been shown to and stepped off by plaintiffs.
"2. The representations made by the defendants were false and the defendants knew they were false.
"3. Plaintiffs believed the representations and in reliance upon them entered into an installment sales contract (a copy of which is attached hereto and marked Exhibit A) as purchaser of the aforementioned parcel of land.
"4. Plaintiffs first became aware that defendants representations were false on April 28, 1975.

"COUNT TWO
"1. Plaintiffs reallege Paragraph 1 of Count One.
"2. The representations made by defendants were false and defendants, without knowledge of the true facts, recklessly misrepresented them.
"3. Plaintiffs reallege Paragraph 3 of Count One.
"4. Plaintiffs reallege Paragraph 4 of Count One.

"COUNT THREE
"1. Plaintiffs reallege Paragraph 1 of Count One.
"2. The representations made by defendants were false and were made by mistake, but with the intention that Plaintiffs should rely upon them.
"3. Plaintiffs reallege Paragraph 3 of Count One.
"4. Plaintiffs reallege Paragraph 4 of Count One."
The original complaint was amended by adding two counts. Count Five, relevant here, follows:

"COUNT FIVE
"1. On or about July 5, 1971, the defendants showed to plaintiffs a certain parcel of land and, along with plaintiffs, stepped off said parcel of land. Defendants represented to plaintiffs that by entering into an installment sales contract plaintiffs were purchasing the parcel of land shown to and stepped off by plaintiffs. *394 On to-wit: July 5, 1971, in reliance upon said representation by defendants, the plaintiff, Wesley C. Lambert, Jr., signed an installment sales contract to purchase Lot S-4 which had been stepped off and shown to plaintiffs by defendants. On to-wit: August 17, 1971, the plaintiff paid to the defendants the sum of $839.52 upon defendants falsely representing to plaintiffs that said Lot S-4 was free and clear and could be purchased by plaintiffs.
"2. The representations made by defendants on to-wit: August 17, 1971, at a dinner meeting in Mobile, Alabama, by the defendants, were false and the defendants knew they were false when made.
"3. Plaintiffs believed the representations and in reliance upon them paid to defendants the sum of $839.52 as a down payment on Lot S-4 Golf East, a copy of which is attached to the original Complaint and marked Exhibit A.
"4. Plaintiffs first became aware that the defendants' representations were false on or about to-wit: February 26, 1975."
The definition of "legal fraud" is found in Title 7, § 108, Alabama Code:
"Misrepresentations of a material fact, made wilfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently, and acted on by the opposite party, constitute legal fraud."
Regardless of whether the representations were made wilfully, recklessly or mistakenly, it has been held that there must be (1) a false representation, (2) the false representation must concern a material existing fact, (3) the plaintiff must rely upon that false representation, and (4) the plaintiff must be damaged as a proximate result. Shafer v. Timmons, 51 Ala.App. 157, 283 So.2d 609 (1973); Pihakis v. Cottrell, 286 Ala. 579, 243 So.2d 685 (1971).
The defendants argue that the plaintiffs have not proved the allegations of their complaint. They also argue that, inasmuch as the plaintiffs have been offered a lot of equal value for the lot for which they contracted, they should not have been awarded punitive damages. We disagree with both of these contentions.
It is argued that, to recover, the plaintiffs must prove that the defendants had an intention to deceive the plaintiffs at the time they sold Lot S-4 to them. The defendants contend that, inasmuch as they did not know that a parking lot would be built which would require the plaintiffs to be shifted to another lot, they should be exonerated from liability. As a general rule, an intent to deceive is an indispensable element to the successful maintenance of a tort action for fraud and deceit. 37 Am. Jur.2d, Fraud and Deceit, § 188. However, it is equally well-established that an action for damages will lie when one makes representations relied upon by another without knowing or caring whether they are true or false. Cooper v. Schlesinger, 111 U.S. 148, 4 S.Ct. 360, 28 L.Ed. 382 (1884); Mid-State Homes, Inc. v. Johnson, 294 Ala. 59, 311 So.2d 312 (1975).
This is such a case. The record is replete with evidence from which the jury could have concluded that the defendants represented to the plaintiffs that they were buying a particular piece of real property which the plaintiffs inspected and which was represented to them to be for sale at a particular price. They acted on this representation and began paying for that lot. Thereafter, the defendants informed them that the lot they had purchased had been "re-designated" and given another lot number. They continued to make payments. It was only after they had made another trip to Point Aquarius that they learned that their payments had been applied to a different piece of real estate. The plaintiffs did not purchase a colored square on an advertising map; they purchased a piece of real estate on a particular site, with specified boundaries as represented to them by the agents of International Resorts. Real estate, by its very nature, is unique and one piece cannot be substituted for another as if they were identical in value and appeal to the purchaser.
*395 The following appears at 37 Am.Jur.2d, Fraud and Deceit, § 239:
"The doctrine of caveat emptor applies generally to the sale of land, as regards conditions open to observation. The doctrine does not, however, bar the right of a purchaser to rely upon statements and representations of material facts made by the vendor to induce the purchaser to enter into the contract for the purchase of the land, nor exempt the vendor from responsibility for the statements and representations which he makes to induce the purchaser to act, when under the circumstances these amount to fraud in a legal sense. . . ."
The pattern of conduct by International Resorts, through its agents, as displayed by the record before us, indicates a total disregard for its obligations under the contract it made with these plaintiffs. There is evidence from which the jury could have concluded that International Resorts misrepresented the facts to these plaintiffs and, whether made intentionally to deceive, or merely made recklessly without regard to their truth, if made so heedlessly without any regard to the consequences, they were sufficient to support the jury verdict.
We have carefully reviewed the entire record in this case. Although the defendants argue several grounds for reversal, we do not find error for doing so. They argue vigorously that the award was excessive. The jury's verdict was originally $100,000. The award of punitive damages is a matter reserved to the discretion of the jury in proper cases. The trial court, on motion for new trial, has remitted the verdict as it had a right to do. Vest v. Gay, 275 Ala. 286, 154 So. 297 (1963). We are not inclined on this record to further reduce it. The judgment appealed from is, therefore, affirmed.
AFFIRMED.
TORBERT, C. J., and BLOODWORTH, MADDOX, FAULKNER, JONES, ALMON and EMBRY, JJ., concur.
BEATTY, J., dissents.
BEATTY, Justice (dissenting).
I dissent.
The majority opinion discusses a reckless misrepresentation and states in substance that the pattern of conduct by International Resorts through its agents, whether done willfully or recklessly, provides evidence sufficient to support the jury verdict in favor of the plaintiffs.
I do not agree. There is no evidence in the record to support the verdict under either Count One or Count Two of the complaint. Count One alleges that the defendants on or about July 5, 1971 made false representations willfully to the plaintiffs and Count Two alleges that the defendants on or about July 5, 1971 made false representations recklessly to the plaintiffs.
The record discloses that Wesley Lambert, after physically inspecting Lot S-4 on July 5, 1971, signed an installment sales contract for it and that on August 17, 1971 the Lamberts made the down payment for Lot S-4. The record is bare of any conduct on the part of the defendants that they did anything with respect to the Lamberts' Lot S-4 until the summer of 1972. The record reveals that sometime during the summer of 1972, about a year after the contract was made, Moody Ray met with International Resorts' project coordinator to determine where to locate the country club parking lot because a sufficiently large one had not been provided for in Robert Trent Jones' Master Plan. The manner in which the parking lot was designed caused encroachment into an area directly adjoining plaintiffs' Lot S-4. This resulted in re-designations of lots in plaintiffs' area with the plaintiffs' lot being re-designated and re-assigned.
In order to sustain the verdict under Count One this Court must find from this record evidence establishing that the defendants knew the representations were false when they were made on July 5, 1971. The record shows that no one knew until the summer of 1972 that a larger parking lot which had not been provided for in the *396 Master Plan would be needed. In other words, the record is completely bare with respect to any consideration of enlargement of the parking lot before the summer of 1972. The requirement of an enlarged country club parking lot, about a year after the representations were made, cannot furnish an inference that the defendants knew the representations they made on July 5, 1971 were false. There is also no evidence in the record which will furnish an inference that the defendants knew on July 5, 1971 that Lot S-4 would have to be re-assigned to another location. Indeed, there are no facts in the record which will furnish an inference that the defendants knew that the representations they made on July 5th were false. Therefore, as alleged in Count One there are no facts in the record from which a reasonable inference can be drawn that the defendants knew the representations were false when they were made.
In order to sustain the verdict under Count Two this Court must find from the record evidence establishing that the defendants on July 5, 1971, without knowledge of the facts recklessly misrepresented to the plaintiffs that they were purchasing Lot S-4. Simply because the record shows that later the plaintiffs' interest was switched to Lot J-2, plaintiffs' sign was moved, and the defendants told the plaintiffs a mistake had been made and they no longer owned Lot S-4, these facts can not support a reasonable inference that the representations were made recklessly. Black's Law Dictionary 1435, (4th ed. 1968) defines reckless as "not recking; careless, heedless, inattentive; indifferent to consequences.. . ." Because the record shows no one knew until the summer of 1972 that a larger parking lot would be needed, how can that fact support a reasonable inference that the representations made at the time of sale were reckless? The plaintiffs have alleged that the defendants' fraud through recklessness occurred on the date the sale was made and the record absolutely fails to show that anyone knew at that time changes in the dimensions of the parking lot would be required. Furthermore, from the record there is no evidence to indicate that anyone expected or even suspicioned that the parking lot would have to be enlarged. As I have previously shown, there is no evidence in the record which will furnish an inference that the defendants knew on July 5th that Lot S-4 would have to be re-assigned to another location. There is not the slightest suggestion that the plaintiffs' and defendants' conduct was not done at arms length or in a business-like-manner. The record discloses no facts which will support a reasonable inference that the defendants' misrepresentations were reckless as alleged in Count Two.
The majority has made a mistake in reasoning that the pattern of conduct displayed by International Resorts, through its agents, is evidence from which the jury could have concluded that the representations were either willful or reckless. In painting with a broad brush, the majority has allowed the jury to consider the questionable business practices of the defendants, which occurred at a much later time, to support the allegations of fraud charged on July 5, 1971. The facts in the record and the reasonable inferences simply do not support the allegations in Counts One and Two.
I would agree, however, that the plaintiffs are entitled to recover their money back because a prima facie case was established under Count Three but the defendants are not guilty of a type of fraud which under the law justifies punitive damages. Therefore, the plaintiffs are entitled to compensatory damages, interest, and costs.
Accordingly, for the error of the trial court in awarding punitive damages I would reverse and remand the case.