**In re INTERNATIONAL RESORTS, INC., Bankrupt.**

**CLEAR CREEK, INC., Plaintiff,**

**v.**

**ROYAL AMERICAN CORPORATION, Defendant.**

**Civ. A. No. 78–A–0911–E.**

United States District Court, N.D. Alabama.

January 19, 1984.

See also, 11th Cir., 751 F.2d 392.

Bankruptcy Act of 1898 [formerly codified as 11 U.S.C. § 110(e)].

## PROCEDURAL BACKGROUND

On December 16, 1977, an involuntary petition in bankruptcy was filed against International Resorts, Inc. (hereafter IRI), an Alabama corporation. IRI was adjudicated a bankrupt on January 24, 1978. Ed Harwell was appointed trustee of the bankrupt estate on February 28, 1978.

On or about April 19, 1978, the trustee filed two suits: (1) a complaint against Royal American Corporation (hereafter RAC) seeking the avoidance, pursuant to § 70(e), of an alleged fraudulent conveyance from IRI to RAC of 50 lots located in Point Aquarius Subdivision, Talladega County, Alabama; and (2) a similar § 70(e) complaint against the Life Insurance Company of America (hereafter LICA) seeking to set aside as fraudulent IRI's conveyance of other property in the Point Aquarius Subdivision.

On August 14, 1978, suit #1 against RAC was transferred to the United States District Court for the Northern District of Alabama, pursuant to Bankruptcy Rules of Procedure, Rule 915(b) (1973), based on RAC's objection to the plenary jurisdiction of the Bankruptcy Court.

On October 22, 1981, United States Bankruptcy Judge Chandler Watson entered an order entitled "Order Confirming Compromise of the Controversy." Pursuant to the compromise, the trustee and the State Court Receiver for LICA settled all litigation between themselves. The compromise involved the sale by the trustee to Clear Creek, Inc. (hereafter Clear Creek) the real property which was the subject of the trustee's suit #(2) against LICA with an allocation of $1,150,000 for this property, plus the 50 lots at Point Aquarius and all other right, title and interest in the property, both real and personal, which was the subject of the trustee's suit #(1) against RAC with an allocation of $250,000 for such property. The $250,000 purchase price included any right and interest the trustee had in the real property that was the sub-

Edward W. Harwell, Anniston, Ala., Trustee.

Charles Cleveland, Birmingham, Ala., for Clear Creek, Inc.

John C. Anderson, Baton Rouge, La., for Royal American Corp.

## REPORT OF MASTER

GEORGE S. WRIGHT, Special Master.

This is a suit to avoid an alleged fraudulent transfer pursuant to § 70(e) of the

ject of the action between the trustee and the defendant, RAC.

On March 8, 1982, the District Court granted the motion of Clear Creek to intervene and be substituted as the real party in interest to the claims of the plaintiff-trustee in this action.

On December 15, 1982, the defendant, RAC, filed a motion for summary judgment based upon two primary grounds: (1) the trustee's inability to sell or assign the § 70(e) action to Clear Creek; and (2) the breach by John Carner, principal stockholder of Clear Creek, of a partnership fiduciary duty owed to RAC.

On March 7, 1983, the District Court entered a memorandum opinion and order denying the defendant's motion for summary judgment and holding that the trustee could sell or assign his rights in a pending § 70(e)(1) action. The court also denied the plaintiff's summary judgment motion. This case was set for trial on June 20, 1983.

On May 24, 1983, the District Court appointed pursuant to F.R.Civ.P., Rule 53, George S. Wright, United States Bankruptcy Judge for the Northern District of Alabama, as special master in this case.

A pretrial conference was held on May 18, 1983, and a second pretrial conference on June 15, 1983. Trial began on June 20, 1983, was intermittently recessed and resumed, ending on August 22, 1983. Based on the evidence presented at that trial, the master makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

RAC is a small publicly-held corporation with its principal place of business in Baton Rouge, Louisiana. In the early 1970's RAC invested in a group of affiliated corporations in Alabama by transferring its wholly-owned insurance company, Royal American Life Insurance Company, to the Alabama companies in exchange for controlling stock in the Alabama parent corporation, Pacific American Corporation (hereafter PAC). PAC owned the controlling stock interest in Life Insurance Company of America (LICA), which owned a controlling stock interest in Investors Corporation of America (hereafter ICA), which in turn owned a controlling stock interest in International Resorts, Inc. (IRI), the bankrupt. In addition, IRI owned the controlling stock in Point Aquarius Country Club, Inc. Thus, RAC owned the controlling interest in PAC, the parent corporation which controlled these affiliated Alabama corporations, including IRI. IRI owned a country club and development resort located in Talladega County, Alabama known as "Point Aquarius." Ultimately, IRI became bankrupt, and this litigation arises out of various events leading to the bankruptcy.

PAC and all of the Alabama subsidiaries were operated and controlled by George Pihakis. RAC determined that Pihakis had mismanaged these corporations and requested and received the resignation of Pihakis over the Alabama corporations sometime in December 1975 or January 1976.

IRI's primary business was to sell residential lots and manage the Point Aquarius resort complex. There were various road, water, sewage, lot title and survey defects and other problems existing at the resort which greatly diminished the market for lot sales. The situation was serious enough to involve inquiry by the Department of Housing and Urban Development. Consequently, during this period, i.e., late December 1975 to January 1976, IRI was suffering through a serious cash-flow problem among other financial woes. As RAC's counsel described, "the company was in trouble." RAC had substantial previous real estate development experience and felt that it could better manage the affairs of IRI and the Point Aquarius project.

In January of 1976, a meeting of the boards of directors of the Alabama corporations was held and RAC was given the right to manage ICA, IRI and Point Aquarius Country Club pursuant to a management contract (See Def.Ex. # 4). This management contract provided, inter alia:

(1) IRI, ICA and the [Point Aquarius] Club employ RAC as their agent and management consultants in supervising,

directing, controlling, operating and managing all aspects of the business activities of IRI, ICA and the Club.

(2) RAC is hereby given authority to perform all acts and services reasonably necessary to conduct the business affairs of the parties to the first part in an efficient, proper and business like manner and to enter into contracts reasonably necessary to conduct these business affairs. RAC shall have full authority to receive and expend the funds for the benefit of the parties of the first part.

The evidence indicates that after the execution of the management contract, RAC controlled and directed the business policy of IRI. Several of RAC's employees, officers and directors were placed in positions of control over IRI. Robert Holloway, a member of the Board of Directors of RAC, became acting president of IRI. Rolfe McCollister, Chairman of the Board of RAC, became Chairman of the Board of IRI. Additionally, Sam Gallo, president of RAC, assumed a substantial role in supervising the management of IRI and the resort development. RAC directed Karl Rodriguez and Lee Fortier to move from Louisiana to the Point Aquarius Project in Talladega, Alabama. Rodriguez assumed the job of president of LICA and Fortier assumed the role of chief operating officer of IRI, a position traditionally referred to as "Land Operations Manager" by RAC. Rodriguez and Fortier were to supervise rehabilitation of the Point Aquarius project and attempt to generate land sales. They primarily handled the large amount of complaints which had arisen concerning the resort's water and sewage systems, road system, residential lot title defects and other problems.

Evidence was presented at trial tending to show that in early 1976, RAC, in connection with its assumption of management control, advanced substantial amounts of funds in working capital to IRI and also paid some of IRI's outstanding debts (See Def.Ex. # 1).

During this same time period, i.e., early 1976, a civil suit against IRI was pending in state circuit court in Talladega, Alabama. This suit was brought by Mr. & Mrs. Wesley Lambert, Jr., purchasers of a residential lot from IRI. The suit alleged fraud and breach of contract by IRI. The jury in the state court suit returned a verdict against the defendant, IRI, late Friday afternoon, April 16, 1976, in the amount of One hundred thousand ($100,000) dollars; however, the judgment was later reduced to Fifty thousand ($50,000)·dollars in a remittitur required by the trial court. The judgment was subsequently affirmed on appeal.[1] Lee Fortier was present at the civil trial representing IRI. After the verdict was returned, Fortier telephoned Karl Rodriguez and informed him of the judgment. Rodriguez discussed the judgment with McCollister and Gallo. Later that afternoon or early Saturday morning, April 17, 1976, Rodriguez telephoned Fortier and instructed him to prepare a deed and transfer approximately 50 Point Aquarius lots from IRI to RAC. The RAC management group provided Fortier with the description of the specific lots to be transferred. The deed (Pl.Ex. # 9) was dated April 19, 1976, and signed for IRI by Lee Fortier as Land Operations Manager. The deed was filed for record in the Office of the Probate Judge, Talladega, Alabama, on that same day, Monday, April 19, 1976, at 9:00 a.m. The Lambert's certificate of judgment (see Pl.Ex. # 7) against IRI was submitted for recordation in the Office of the Probate Judge, Talladega, Alabama on that same day, Monday, April 19, 1976, at 11:00 a.m. —two hours after the recordation of the deed.

Ultimately, RAC was unsuccessful in managing IRI and the Point Aquarius resort. Sometime in October or early November of 1976, RAC decided to terminate the management contract with IRI. On November 1, 1976, LICA, ICA and IRI executed an agreement (See Pl.Ex. # 10) which transferred management of the Point Aquarius complex to LICA, relieving

1. See *International Resorts, Inc. v. Lambert,* 350    So.2d 391 (Ala.1977).

**410**

RAC of this function. In addition, pursuant to this agreement, IRI transferred to LICA all of its right, title and interest in the lots remaining at Point Aquarius that were not previously transferred to RAC.

After the Lambert judgment against IRI was affirmed on appeal, the Lamberts set out to collect this judgment. Their efforts, however, were unproductive. Thus, on December 16, 1977, the Lamberts filed an involuntary bankruptcy petition against IRI and adjudication as a bankrupt followed on January 24, 1978. On or about April 19, 1978, the trustee in bankruptcy filed two § 70(e) fraudulent conveyance suits; one based on IRI's transfer of lots to RAC on April 19, 1976, and one based on IRI's transfer of lots to LICA on November 1, 1976. These two suits remained dormant for a substantial period of time due to settlement negotiations.

During 1978 and 1979, RAC explored the prospects and potential for purchasing the Point Aquarius project. RAC, through Sam Gallo, made various contacts with IRI's trustee and with the Insurance Commissioner for the State of Alabama, which had become the receiver for LICA, in regard to purchasing the project and settling pending litigation.

In the fall of 1979, Gallo met with John Carner and discussed forming a partnership for the purpose of purchasing, managing and marketing the Point Aquarius project. On January 28, 1980, a formal partnership agreement was executed between Sam Gallo, RAC, and Neda, Inc. John Carner was the sole stockholder of Neda, Inc. The partnership was known as Gallo and Associates Real Estate Partnership. Also involved in negotiations with the Alabama Insurance Commissioner was an Alabama corporation, Clear Creek, Inc. (Plaintiff in this case), which held a pre-existing right of first refusal to purchase the Point Aquarius property. The Gallo partnership made a bid to purchase the property from the Insurance Commissioner, but this offer was refused because of a higher bid. There is conflicting testimony as to what transpired after the rejection of the bid. Nevertheless, following the rejection of the Gallo partnership's bid, Carner, individually, purchased 100% of the stock in Clear Creek. Finally, by agreement dated April 21, 1980 (See Pl.Ex. # 11), Clear Creek utilized its right of first refusal and purchased all of the Bankruptcy trustee's and the State Insurance Commissioner's right, title and interest in the Point Aquarius property. This included the trustee's § 70(e) action against RAC.

## ISSUES

In general, the plaintiff, Clear Creek, contends that the April 19, 1976 conveyance by deed of approximately 50 lots in the Point Aquarius resort from IRI to the defendant, RAC, should be set aside on the following two grounds:

(1) As a fraudulent conveyance under § 70(e)(1) of the Bankruptcy Act of 1898, which incorporates "State law applicable thereto," in this case, Alabama's Fraudulent Conveyance Act, Ala.Code § 8–9–6 (1975); and

(2) On the ground that such conveyance was made without corporate authority.

The defendant, RAC, defends upon these grounds:

(1) Defendant denies that the conveyance was fraudulent and denies that said conveyance violated § 70(e)(1) of the Bankruptcy Act of 1898;

(2) Defendant denies that the conveyance was made without corporate authority;

(3) Defendant contends that Clear Creek, whose sole stockholder is John Carner, is not entitled to relief as whatever right or interest it obtained from the trustee was in derogation of a fiduciary duty arising from the partnership relationship between Neda, Inc., whose sole stockholder is also John Carner, and the defendant, RAC; and

(4) Defendant argues that Clear Creek should be denied recovery because it cannot give RAC rescission or its distributive share in the bankruptcy estate of IRI.

## CONCLUSIONS OF LAW

### I. SECTION 70(e)(1) Fraudulent Conveyance

█ Section 70(e)(1) provides: "A transfer made or suffered or obligation incurred by a debtor adjudged a bankrupt under this Act which, under any Federal *or State law applicable thereto*, is fraudulent as against or voidable for any other reason by any creditor of the debtor, having a claim provable under this Act, shall be null and void as against the trustee of such debtor." (Underlining for emphasis) Under § 70(e)(1) the trustee may avoid a transfer that is voidable under applicable law, including state law. See 4B *Collier on Bankruptcy* ¶ 70.71 et seq. (14th ed. 1978); *In re Southern Metal Products Corporation,* 26 F.Supp. 666 (N.D.Ala.1939).

Plaintiff, Clear Creek, as assignee of the trustee's action under § 70(e)(1),[2] is proceeding under Alabama's Fraudulent Conveyance Act codified at Ala.Code § 8–9–6 (1975). A § 8–9–6 action is subject to a ten-year statute of limitations. See Ala. Code § 6–2–33(2) (1975); *Swan v. Magnusson,* 418 So.2d 844 (1982); *In re Bethune,* 18 B.R. 418 (Bkrtcy.N.D.Ala.1982). The transfer from IRI to RAC occurred in 1976 and this action was commenced in 1978; thus, this suit is not time barred.

The Alabama Fraudulent Conveyance Act § 8–9–6, provides:

All conveyances or assignments in writing, or otherwise, of any estate or interest in real or personal property and every charge upon the same made with intent to hinder, delay or defraud creditors, purchasers or other persons of their lawful actions, damages, forfeitures, debts or demands, and every bond or other evidence of debt given, action commenced or judgment suffered with the like intent, against the persons who are or may be so hindered, delayed or de-

frauded, their heirs, personal representatives and assigns are void.

This statute embodies the English Statute of Frauds and is affirmatory of the common law. *Fleming v. Kirkland,* 226 Ala. 222, 146 So. 384 (1933); *Gilliland v. Fenn,* 90 Ala. 230, 8 So. 15 (1889).

█ The concurrence of three elements is necessary before a conveyance can be declared fraudulent under this statute. It must be shown that there is: (1) a creditor to be defrauded (2) a debtor intending to defraud, and (3) a conveyance of property out of which the creditor could have realized his claim or some portion thereof. *Roddam v. Martin,* 285 Ala. 619, 235 So.2d 654 (1970). "Further proof, however, is required before a conveyance found to be fraudulent is due to be set aside." *J.C. Jacobs Banking Co. v. Campbell,* 406 So.2d 834 at 843 (Ala.1981).

█ The type (i.e., tort or contract) and time of a creditor's claim (i.e. existing or subsequent) also affects the proof required to declare a conveyance fraudulent. An existing creditor is one who has a claim against the grantor-debtor before transfer, whereas a subsequent creditor has no claim against the grantor-debtor until after the transfer. A subsequent creditor must prove actual fraud. *Galloway v. Shaddix,* 197 Ala. 273, 72 So. 617 (1916). The rule for determining whether a tort claimant is an existing or subsequent creditor is as follows: "Ordinary claims for damages arising from torts are within the protection of the statute [§ 8–9–6] ... It is not the judgment which creates the relation of creditor under the statute, but the wrong which produces the injury ... Hence, the date of the wrongful act and not the filing of suit or the recovery of the judgment, fixes the status and rights of the parties." *Roddam v. Martin,* supra, at 285 Ala. 622. In the instant case, the trustee's, now Clear

---

**2.** As mentioned previously under heading "Procedural Background," on December 15, 1982, RAC moved for summary judgment based on the contention that the trustee could not sell or assign his § 70(e)(1) cause of action. On March 7, 1983, the District Court denied the defend-

ant's motion for summary judgment and held that a trustee, who has already initiated suit to avoid a transfer under § 70(e)(1), may validly and effectively sell and assign his right, title and interests in a pending action under § 70(e)(1).

Creek's, § 70(e)(1) action was based on the Lambert's tort judgment against IRI. As the wrongful act underlying the Lambert's tort judgment occurred long before the allegedly fraudulent transfer of April 19, 1976, the trustee's, now Clear Creek's, claim is that of an existing creditor.

The case of *Smith v. Wilder*, 270 Ala. 637, 120 So.2d 871 (1960), is generally recognized as the leading Alabama opinion governing fraudulent conveyances wherein an existing creditor seeks to set aside a conveyance of his debtor.[3] See *Brett v. Zodiac Industries, Inc.*, 409 So.2d 451, (Ala.Civ.App.1982). In a relatively recent case, the Alabama Supreme Court reaffirmed these principles set out in the *Smith v. Wilder* case:

> An existing creditor seeking to set aside a conveyance may do so either because of actual fraud or on account of what is termed constructive fraud.
>
> Actual fraud denotes the actual mental operation of intending to defeat or delay the rights of the creditor.
>
> Constructive fraud, on the other hand, is based on facts and circumstances which the courts have said constitute legal fraud irrespective of actual intent. The term "constructive fraud" is generally used in referring to those instances where a grantor, indebted at the time, conveys property on a good as distinguished from a valuable consideration. Such conveyances are frequently referred to simply as voluntary conveyances.

With respect to the burden of proof, the court made the following declarations:

> The burden is upon an existing creditor alleging actual fraud to prove it. *Birmingham Trust & Savings Co., v. Shelton*, 231 Ala. 62, 163 So. 593.
>
> Where a conveyance is sought to be vacated on the ground that it was voluntary, the burden is upon the complainant to show that his debt antedated the conveyance attacked.
>
> When such proof is made the burden shifts to the grantee to go forward with the evidence.

. . . . .

> If the evidence shows that the alleged fraudulent grantor was insolvent, failing or financially embarrassed when he made the conveyance, even though the consideration paid by the grantee was a new one, the burden is upon the grantee of showing a consideration both valuable and adequate.
>
> However, if it does not appear that the grantor was insolvent, failing or financially embarrassed when he made the conveyance and the evidence shows that the consideration paid by the grantee was a new one, not resting on prior indebtedness, the only burden upon the grantee is to show that he paid a valuable consideration—substantial and not merely nominal.

. . . . .

> But proof of payment of a present substantial valuable consideration did not in and of itself determine the rights of the parties.
>
> Even though a consideration for the deed was a present valuable consideration, the complainants could have the deed vacated in its entirety by showing the grantor's intent to defraud and a participation therein by the purchaser ... with knowledge of such intent or with notice of some fact calculated to put him on inquiry which, if followed up, would have lead [sic] to a discovery of the grantor's fraudulent intent. The burden of making such a showing was on the complainants. *McClintock v. McEachin*, 249 Ala. 591, 32 So. 305, and cases cited.[4]

---

**3.** For an excellent discussion and analysis of Alabama's fraudulent conveyance law prior to *Smith v. Wilder*, see Judge J. Harris, "Some Aspects of Fraudulent Conveyances in Alabama," 6 Alabama Lawyer 170 (1945). This article was cited by the court in *Smith v. Wilder, supra.*

**4.** See chart attached as Appendix A for skeleton outline of the judicial construction of present Alabama Fraudulent Conveyance Act—§ 8–9–6.

*J.C. Jacobs Banking Co. v. Campbell,* 406 So.2d 834, at 841–42 (Ala.1981).[5] See also *Alabama Credit Corporation v. Deas,* 417 F.2d 135 (5th Cir.1969).

Clearly, in this case there exists a creditor to be hindered, delayed or defrauded (i.e., the Lamberts) and there was a conveyance of property out of which the creditor could have realized his claim, or at least some of it. Thus, two of the three elements required in *Roddam v. Martin,* supra, are clearly present. Yet, before the conveyance can be declared fraudulent, it must be determined that the debtor (i.e., IRI) intended to hinder, delay or defraud.

■ Actual fraud may be shown by direct testimony or admissions, but most often it is revealed through circumstantial evidence. The intention is a mental emotion, of which the external signs are the acts and declarations of the parties, taken in connection with the concomitant circumstances. *Seals v. Robinson,* 75 Ala. 363 (1883). See also *Shealy & Finn v. Edwards,* 75 Ala. 411 (1883).

■ In the case at bar, the intent of the grantor, IRI, and of the grantee, RAC, at the time of the April 19, 1976 conveyance is manifested by the following facts and circumstances.

(1) A thorough examination by the master must follow a transfer between such closely related corporations. Here, RAC, through its control of the affiliated Alabama corporations, effectively controlled IRI. Close relationships between corporations can be comparable to that of family members, and, as such, any transfer from one to the other should be subjected to strict scrutiny. *United Towing Company v. Phillips,* 242 F.2d 627 (5th Cir.1957); 4B *Collier on Bankruptcy* ¶ 70.72 at 806 (14th ed. 1978).

(2) The conveyance from IRI to RAC occurred immediately after a judgment for

$100,000 was rendered against IRI. A conveyance during, immediately preceeding or following a suit against the grantor-debtor creates an indicia or badge of fraud. See *Cioli v. Kenourgios,* 59 Cal.App. 690, 211 P. 838 (1922); *J.C. Jacobs Banking Co. v. Campbell,* supra.

(3) Lee Fortier, RAC's appointed Land Operations Manager for IRI, testified that he was present and represented IRI at the civil trial. After the jury returned a verdict against IRI (April 16, 1976), Fortier immediately telephoned Karl Rodriguez and informed him of the verdict. Karl Rodriguez testified that after receiving the call from Fortier concerning the judgment, the management of RAC, consisting of McCollister, Gallo, etc., then decided to transfer the lots to RAC. They telephoned Fortier that same night or the next morning, Saturday, April 17, 1976, and provided him with a legal description of the lots to be transferred by deed. Rodriguez testified that these particular lots were chosen because they had good title, free and clear of liens. Fortier prepared the deed, signed it, and recorded it Monday morning, April 19, 1976, only hours before the judgment was recorded. Rodriguez testified that the deed was prepared and recorded as soon as possible in order to beat the recordation of the judgment.

Rodriguez and Gallo also testified that RAC had previously discussed and planned to transfer or take lots from IRI in satisfaction of the indebtedness owed RAC by IRI. Fortier, however, stated that until the time of conveying the lots, he had no knowledge of a plan to transfer lots to RAC in satisfaction of a debt.

These facts and circumstances lead the master to the conclusion that the conveyance by IRI to RAC was made with the intent to hinder, delay or defraud the Lamberts in the collection of their judgment.[6]

---

**5.** *J.C. Jacobs Banking Co. v. Campbell,* supra, did overrule *Smith v. Wilder,* in one limited aspect which is not relevant to this case.

**6.** "The intent to defraud ... is sometimes a question of fact and sometimes a question of

law. If the necessary consequence of a given act, on the part of a debtor, is to hinder, delay, or defraud his creditor, then the law conclusively presumes that it was committed with intent to defraud, no matter what was the motive that prompted the act." *Virginia Carolina Chemical*

The obvious purpose of the transfer was to conceal these lots from the Lamberts and thus hinder and delay their collection efforts. See *Headley v. Headley*, 264 Ala. 383, 88 So.2d 341 (Ala.1956). Yet, as previously mentioned, further proof is necessary to set aside a conveyance that has been declared fraudulent. See *J.C. Jacobs Banking Co. v. Campbell*, supra, at 843.

During the trial, RAC expended a large amount of time and effort attempting to prove that IRI was solvent at the time of conveyance to RAC and that RAC had paid more than adequate consideration for the lots conveyed by cancelling a substantial amount of debt owed RAC by IRI. Assuming, arguendo, that RAC has shown that IRI was solvent at the time of the transfer and that RAC paid a valuable and adequate consideration for the lots,[7] then the applicable law is as follows:

Where it appears the transfer in question was made for a valuable consideration, a plaintiff seeking to invoke the protection of Code 1975, § 8-9-6, must show the mutual fraudulent intent of the parties to the transaction. Proof of the grantor's intent alone is insufficient to cause the conveyance to be set aside. See 37 Am.Jur.2d Fraudulent Conveyances § 6 (1954).

The reason for this requirement is that, failing such proof, the grantee is a bona fide purchaser for value who is entitled to keep the fruits of his bargain. See Harris, "Some Aspects of Fraudulent Conveyances in Alabama," 6 Ala.Law 170 (1945). The cases are replete with holdings that where the grantor is not insolvent, failing or financially embarrassed, a plaintiff creditor must prove participation by the grantee in the form of knowledge of the grantor's fraudulent intent, or notice of facts putting him on inquiry, which, if followed up, would lead to discovery of the grantor's intent; this would be required in order to set aside a fraudulent conveyance made for present valuable consideration. *McClintock v. McEachin*, supra; *Van Antwerp v. Van Antwerp*, 242 Ala. 92, 5 So.2d 73 (1941); *London v. G.L. Anderson Brass Works*, supra; *Ledgetter v. Davenport Bros.*, 154 Ala. 336, 45 So. 467 (1908); *Pippin v. Tapia*, 148 Ala. 353, 42 So. 545 (1906); *Smith v. Heineman*, 118 Ala. 195, 24 So. 364 (1897); *Florence Sewing Machine Co. v. Zeigler*, 54 Ala. 221 (1877); *Crawford v. Kirksey*, 55 Ala. 282 (1876).

*J.C. Jacobs Banking Co. v. Campbell*, supra, at 843.[8]

Based on the evidence previously discussed, the master determines that RAC, as grantee, had actual notice of IRI's fraudulent intent and participated in it. Moreover, it is apparent that RAC not only participated in the fraudulent intent but actively directed, perpetrated and instigated the transfer of lots. Testimony of the resident Alabama directors of IRI reveals that before and at the time of the conveyance, RAC's representatives controlled and dominated the business, direction and policy of IRI. RAC, as managing agent of IRI, made the decision to transfer the lots to itself, intending to place the property beyond the reach of the Lamberts (i.e., hinder, delay or defraud) and to secure a preference for itself. In reality, the intent to hinder, delay or defraud was more that of the grantee, RAC, than the grantor, IRI. "A debtor is not forbidden from making an honest preference of creditors in the pay-

*Corporation v. Satsuma Orange & Pecan Groves Co.*, 227 Ala. 55, 148 So. 853 at 855 (1933). There can be no doubt that the "necessary consequence" of the conveyance from IRI to RAC was to, at least, hinder and delay a creditor, the Lamberts.

7. The evidence is inconclusive at best. There is little, if any, evidence concerning the solvency of IRI at the exact time of the transfer of lots. Although IRI may have been solvent at the time of the transfer (i.e., April 1976), the evidence indicates that the company was, at best, "failing or financially embarrassed."

8. See also *Reynolds v. Welch*, 47 Ala. 200 (1872) (Where there is actual intent to hinder, delay or defraud, then the existence of a just debt, or other valuable consideration is insufficient to uphold the transaction); *Butler v. Feeder*, 130 Ala. 604, 31 So. 799 (1901) (Where collusion is involved, the solvency of the debtor is immaterial).

ment of his debts, provided he does so without any intent to hinder or delay his creditors." *Sheely & Finn v. Edwards*, 75 Ala. 411 at 418 (1883) [citing *Crawford v. Kirksey*, 55 Ala. 282 (1876)]. Here, however, the transfer from IRI to RAC was the product of collusive fraudulent intent between the grantor and grantee. Therefore, the master concludes that this was a fraudulent conveyance contemplated by Ala.Code § 8–9–6 (1975) and because of the fraudulent collusion between the grantor, IRI, and the grantee, RAC, the plaintiff's complaint, pursuant to § 70(e)(1) of the Bankruptcy Act of 1898, to avoid and set aside said conveyance should be granted.

## II.  AUTHORITY TO CONVEY

Additionally, the plaintiff contends that the management contract (Def.Ex. # 4) between IRI and RAC is void as an unlawful abdication of management responsibility by IRI's Board of Directors pursuant to Ala.Code § 10–2–50 (1975).[9] Plaintiff, Clear Creek, also asserts that the conveyance from IRI to RAC is void as it was made without authorization by the Board of Directors of IRI.

Section 10–2–50 (1975) provides, inter alia, "[e]xcept as may otherwise be provided in the certificate of incorporation, the business and affairs of a corporation shall be managed by a board of directors." This section was interpreted recently by the Alabama Supreme Court in *Roach v. Bynum*, 403 So.2d 187 (1981). In *Roach* the court stated that corporate bylaws which vest the authority to manage corporate affairs in the President, in conflict with the corporation's Articles of Incorporation, violates § 10–2–50 and are thus void. The master, however, is of the opinion that the *Roach* case is distinguishable from the case at bar. Here, the management contract employed RAC as managing agent and consultant. This contract, by its terms, did not completely divest IRI's Board of Di-

rectors of its management authority,[10] as did the bylaws in *Roach v. Bynum*. This contract is similar to a management contract considered by a California court in *Oliphant v. Home Builders*, 34 Cal.App. 720, 168 P. 700 (Civ.App.1909), wherein the court noted: "However broad the terms of the contract of employment, we do not believe that it may be said that they were broad enough to divest the board of directors of the authority imposed upon that board by law to manage and control the affairs of the corporation; nor do we think there was any intent on the part of the board to so delegate its power." At 168 P. 701. The contract created an agency relationship and granted RAC, as agent, broad powers and authority to manage the business affairs of IRI, which involved developing and selling lots in the Point Aquarius complex. The evidence indicates that RAC was given a free hand in managing the business. IRI placed no restrictions on RAC's management. Testimony revealed that IRI's Board of Directors continued to meet and were active during the period before and after the conveyance. Lee Fortier, who had been appointed land operations manager by RAC, signed the deed conveying the lots from IRI to RAC. RAC introduced a resolution (See Def.Ex. # 25) dated April 7, 1976, which states that it was adopted at a meeting of IRI, authorizing Lee Fortier to execute and sign deeds and contracts transferring real estate in Point Aquarius. This resolution is signed by Robert Holloway as president of IRI. There is conflicting testimony on whether this resolution was actually passed by IRI's Board of Directors. In any event, the master concludes that RAC, and thus Lee Fortier, had authority to sign deeds and transfer lots. "Unless the authority of a general manager is restricted, his authority and powers are coextensive with the powers of the corporation itself, and he has the authority to do any act on its own behalf ... in the ordinary course of the company's

---

**9.**  This code section has since been repealed and replaced by Ala.Code § 10–2a–57 (Supp.1983), effective January 1, 1981. This amended section contains a similar provision.

**10.**  The evidence, however, indicates that in actuality, because of corporate affiliation, dual directorships and the management contract, RAC controlled the operation of IRI.

business." *Belcher v. Birmingham Trust National Bank*, 348 F.Supp. 61 at 122 (N.D.Ala.1968). IRI, as principal, had the power to control its managing agent, RAC, regardless that it failed to exercise such power.

■ Plaintiff argues that RAC, as agent, could not deed its principal's property to itself. Indeed, it is generally held that an officer, director or agent cannot convey the principal's property to itself without express authority. See *Hall v. Cosby*, 288 Ala. 191, 258 So.2d 897 (Ala.1972); *Dillard v. Gill*, 231 Ala. 662, 166 So. 430 (1936); *Fisher v. National Mortgage Loan Company*, 132 Neb. 185, 271 N.W. 433 (Neb. 1937). The evidence indicates that there was no express authority for RAC to transfer the lots to itself. The resolution did not give such authority. There is, however, evidence that the conveyance was disclosed to IRI's Board of Directors at subsequent meetings and that the directors acquiesced in the transaction. Such evidence justifies the conclusion that the Directors ratified the transaction. See 19 C.J.S. Corporations § 1018 et seq. (1980). Further, plaintiff cites *Textile Mills v. Colpack*, 264 Ala. 669, 89 So.2d 187 (1956), which held that directors or officers are not permitted to give away corporate property except in limited instances. This principle of law is inapplicable to this case as there is an abundance of evidence demonstrating that RAC had given consideration[11] for the conveyance by advancing and lending funds as working capital for IRI.

■ Finally, in this case the managing agent of a corporation transferred corporate property to itself. Assuming, arguendo, that the transfer was unauthorized and a breach of an agent's fiduciary duty, plaintiff, Clear Creek, cannot complain unless the transfer was fraudulent. This action was originally commenced by the bankruptcy trustee of IRI pursuant to § 70(e)(1) of the Bankruptcy Act which allows the trustee to set aside or avoid any transfer or obligation that is fraudulent as against or voidable by any creditor of the debtor. Thus, the trustee stands in the shoes of a creditor of the debtor, here the Lamberts. Consequently, Clear Creek, as assignee of the trustee's § 70(e)(1) action, also has only the rights of a creditor of the debtor, IRI. Under Alabama law, it is clear that a mere corporate creditor cannot hold an officer or agent of a corporation responsible for a negligent, unauthorized or ultra vires act, as distinguished from a fraudulent transfer or misapplication of corporate assets from the payment of corporate debts. See *Force v. Age Herald Co.*, 136 Ala. 271, 33 So. 866 at 868 (Ala.1903). Such an act or transfer may be voidable by the corporation and its stockholders but not by a creditor. This is because corporate directors, officers and agents owe a fiduciary duty to the corporation but not to the creditors. In *O'Connor Mining & Manufacturing Co. v. Coosa Furnace Co.*, 95 Ala. 614, 10 So. 290 (1891), the Alabama Supreme Court stated this principle:

The creditors are not entitled to disaffirm a transfer of the property of the corporation, made by its directors or other agents, merely because the corporation itself or its stockholders could have done so. When a disposition of the property of a corporation is assailed by its creditors, they are not clothed with the right of the corporation or of its stockholders to set aside the transaction, regardless of its fairness or unfairness, on the ground that it was entered into by representatives of the corporation who had put themselves in a relation antagonistic to the interests of their principal. The right of the creditor to impeach the transaction depends upon its fraudulent character. The question in such case is, was the transaction which is complained of entered into with the intent to hinder, delay, or defraud creditors,—was the property fraudulently transferred or conveyed or attempted to be fraudulently

---

**11.** Although the amount of consideration is contested, the evidence reveals that some (possibly a substantial amount) funds were advanced by RAC to IRI during the term of the management contract.

transferred or conveyed? The mere fact that the corporation, in disposing of its property, dealt with persons who at the same time were charged with the duty of representing its interests does not by itself render the transaction fraudulent. At 10 So. 292.

See also *National Union Life Insurance Company v. Ingram,* 275 Ala. 310, 154 So.2d 666 (1963); *James Supply Company v. Frost,* 214 Ala. 266, 107 So. 57 (1925).

The master has previously determined that the transaction was fraudulent and due to be set aside, thus, this contention by the plaintiff is without merit.

### III. BREACH OF FIDUCIARY DUTY

The defendant, RAC, maintains that plaintiff, Clear Creek, is not entitled to the equitable relief it seeks under § 70(e)(1) of the Bankruptcy Act. This contention rests on the relationship between John Carner and the defendant. RAC, Sam Gallo, and Neda, Inc., entered into a partnership agreement in January 1980, for the purpose of purchasing and managing the Point Aquarius complex. Carner is the sole stockholder of Neda, Inc. The partnership efforts to purchase Point Aquarius were futile. Subsequently, Carner, individually, acquired 100% of the stock in Clear Creek. Then in April 1980, Clear Creek purchased the trustee's interest in the Point Aquarius complex and the trustee's interest in the § 70(e)(1) litigation against RAC. Thus, in sum, RAC alleges that Carner acquired this § 70(e)(1) action in breach of a partnership fiduciary duty owed to the defendant.

Federal Jurisdiction in this case is based on diversity of citizenship. Section 23 of the Bankruptcy Act determines the jurisdiction of district courts in plenary actions by the trustee against third-party claimants. Pursuant to § 23(a), such a proceeding is treated as if the bankrupt had not instituted bankruptcy proceedings and jurisdiction is determined as if the action were between the bankrupt and the adverse party. Thus, the jurisdictional basis is diversity of citizenship as IRI is an Alabama corporation and RAC is a Louisiana corporation. Substitution of Clear Creek, as plaintiff, does not affect the jurisdiction as Clear Creek is also an Alabama corporation.

Since this is a diversity of citizenship case, the forum state's conflict of laws rules would apply. *Klaxon v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

"Alabama, the forum state, follows a place-of-performance rule where a contract is to be performed in a place other than where it is made." *First National Life Insurance Company v. Fidelity & Deposit Company of Maryland,* 525 F.2d 966 at 967 (5th Cir.1976). See also *United States Fidelity & Guaranty Co. v. Slifkin,* 200 F.Supp. 563 (N.D.Ala.1961). The partnership agreement clearly shows that the parties contemplated total performance in Alabama, thus Alabama law applies.

Under Alabama law, the relationship between partners is fiduciary in nature. *Smith v. Rosson,* 233 Ala. 219, 171 So. 375 (1936). See also Ala.Code § 10–8–48 (1975) (Partner accountable as a fiduciary). Alabama Courts have also held that any member of an ordinary partnership, after notice to the other partners, may dissolve the partnership at will and the partnership exists thereafter only for the purpose of winding up affairs. *McDonough et al. v. Saunders,* 201 Ala. 321, 78 So. 160, 164 (Ala.1917). In addition, Ala. Code § 10–8–91 provides:

Dissolution is caused: (1) without violation of the agreement between the partners: (a) by the termination of the definite term or particular undertaking specified in the agreement, (b) by the express will of any partner when no definite term or particular undertaking is specified.

Likewise, the partnership may be dissolved by mutual consent. *Goldsmith v. Eichold Bros.,* 94 Ala. 116, 10 So. 80 (Ala.1891). The fiduciary duty continues until the relationship is terminated or dissolved. See 60 Am.Jur.2d Partnership § 124 (1972); *Meinhard v. Salman,* 249 N.Y. 458, 164 N.E. 545 (1928); *Fouchek et*

*al. v. Janicek*, 190 Or. 251, 225 P.2d 783 (Or.1950).

█ It is clear that a corporation may be a partner in Alabama. See Ala.Code § 10–8–2(3) & (7) (1975). It is equally clear "[t]hat a corporation is a distinct entity, to be considered separate and apart from the individuals who compose it, and is not to be affected by the personal rights, obligations and transactions of its stockholders; and this, whether said rights accrued, or obligations were incurred, before or subsequent to incorporation." *Loper v. Gill*, 282 Ala. 614, 615, 213 So.2d 674 (Ala.1968).

Carner testified that he made no attempt to acquire the stock of Clear Creek or to negotiate for the purchase of the trustee's interest in the Point Aquarius property and this lawsuit until after the partnership's offer to purchase had been rejected. Additionally, Carner alleges that after the rejection of the partnership's bid, he disclosed to Gallo his intention to purchase Clear Creek and exercise Clear Creek's option to purchase the Point Aquarius property. Carner testified that he had no knowledge of the trustee's litigation against RAC until after the rejection of the partnership's offer and after his purchase of Clear Creek. In contrast, Gallo stated that he and Carner had discussed the trustee's litigation against RAC in January 1980. Gallo considered the partnership to be existent until formally dissolved in 1981. Gallo, however, testified that he talked with Carner after the partnership's offer had been rejected and Carner suggested they purchase the stock in Clear Creek and exercise its option to purchase the Point Aquarius property. At that time, Gallo informed Carner that he was not interested and would have to back away from the deal.

█ Based on the foregoing, the master concludes that a dissolution of the partnership occurred after the rejection of the partnership's bid and Gallo's refusal to continue with Carner in negotiations to purchase Clear Creek. The bid rejection and subsequent conversation between Carner and Gallo indicates that the specific purpose of the partnership, i.e., purchase of Point Aquarius, had terminated. Carner disclosed to Gallo his intention to go ahead and attempt to purchase Clear Creek. The master also concludes that Carner had no knowledge of the trustee's litigation against RAC at the time of this dissolution.

█ In addition, a sole stockholder (i.e., Carner) of a corporate partner (i.e., Neda, Inc.) owes no fiduciary duty to a partnership, save where sufficient facts and circumstances justify disregarding the corporate shield. See *Loper v. Gill*, supra. There is insufficient evidence in this case to warrant "piercing the corporate veil" of Neda, Inc., and charging Carner, individually, with such a fiduciary duty.

In sum, RAC's contention that Clear Creek should be denied relief based on John Carner's breach of a fiduciary duty is without merit and overruled.

## IV. DISTRIBUTIVE SHARE IN THE BANKRUPTCY ESTATE OF IRI

█ Finally, RAC argues that Clear Creek should be denied recovery in this action because it cannot give RAC rescission or its distributive share in the bankruptcy estate of IRI. The master does not agree. Section 57(n) of the Bankruptcy Act of 1898 provides, inter alia:

> ... And provided further, That a claim arising in favor of a person by reason of the recovery by the trustee from such person of money or property, or the avoidance by the trustee of a lien held by such person, may be filed within thirty days from the date of such recovery or avoidance, but if the recovery is by way of a proceeding in which a final judgment has been entered against such person, the claim shall not be allowed if the money is not paid or the property is not delivered to the trustee within thirty days from the date of the rendering of such final judgment, or within such further time as the court may allow.

Additionally, Bankruptcy Rules of Procedure, Rule 302(e)(3) provides:

> (3) A claim which arises in favor of a person or becomes allowable because of

a judgment for the recovery of money or property from such person or because of a judgment denying or avoiding a person's interest in property may be filed within 30 days after such judgment becomes final, but if the judgment imposes a liability which is not satisfied, or a duty which is not performed, within such period or further time as the court may permit, the claim shall not be allowed.

Read together, these two provisions give a creditor the right to file his claim against the bankrupt estate thirty days after a judgment avoiding the creditor's interest in property becomes final.

RAC argues that § 57(n) speaks only in terms of "recovery by the trustee" and strictly applied provides RAC the right to file a claim for any amounts disgorged only where the litigation is brought by the trustee, and, as such, Clear Creek cannot offer RAC a claim in the IRI bankruptcy. This argument is also unfounded. This litigation was initially brought by the trustee, for the benefit of the estate, and subsequently assigned to Clear Creek in exchange for substantial monetary considera-

tion. Apparently, this is another attempt by RAC to attack the validity of the trustee's assignment of this pending § 70(e)(1) action to Clear Creek. The District Court has previously upheld that assignment and the substitution of Clear Creek as plaintiff.[12] Therefore, the master determines that § 57(n) and Rule 302(e)(3) are applicable to this proceeding. It was earlier determined in this report that the April 19, 1976 conveyance from IRI to RAC was fraudulent and due to be avoided and set aside pursuant to § 70(e)(1). These provisions will give RAC the right to file a claim against the IRI bankruptcy estate within thirty days after such judgment becomes final.

### CONCLUSION

Based on the foregoing discussion and analysis, the master concludes that the conveyance from IRI to RAC of 50 lots located in Point Aquarius Subdivision, Talledaga County, Alabama, is due to be set aside as a fraudulent conveyance under § 70(e) of the Bankruptcy Act of 1898.

**12.** See note 2 supra.