This is an appeal by the plaintiff, Sergeant Robert Jakob, from a summary judgment granted in favor of the defendant, First Alabama Bank of Montgomery, N.A.
Sergeant Jakob (Jakob), an active duty non-commissioned Air Force officer, applied for membership at the Maxwell Air Force Base Non-Commissioned Officers' Open Mess (NCO Club) by executing a membership application on January 23, 1973. The pertinent portions of that agreement are:
 (1) Air Force regulations require dues to be payable in advance for each month and accounts become delinquent on the 15th day of the month following the month in which they were incurred.
 (2) Should I desire to resign, my resignation must be submitted in writing to avoid incurring dues charged to my account.
 (3) I understand that I am liable for dues from this date forth and agree to abide by the above stated terms.
Thereafter, he and his wife received NCO Club cards. The reverse side of the cards issued to Jakob and his wife stated:
 THE MEMBER FOR WHOSE BENEFIT THIS CARD IS ISSUED, ASSUMES FULL RESPONSIBILITY FOR ALL PURCHASES MADE BY USE OF THIS CARD PRIOR TO ITS SURRENDER TO THE MESS OR GIVING THE MESS NOTICE IN WRITING THAT THE CARD HAS BEEN LOST OR STOLEN.
In June, 1974 the management of the NCO Club and the First National Bank of Montgomery, N.A. (now the First Alabama Bank of Montgomery, N.A.) (Bank) made an agreement which included an assignment of the NCO Club accounts and contract rights to the Bank. Jakob was later notified of this assignment at an NCO Club meeting and through the mail by a newsletter dated 4 June 1974:
Dear Member:
 Management of the club is constantly trying to cope with all expenses necessary for the club operation. Careful research indicates that we can effect a substantial savings by converting our accounts receivable from our present internal system to First National Bank (FNB) BankAmericard. Therefore, effective 1 July 1974, we are adopting this system. This is a management tool that has been developed to continue our effort to meet rising costs and hold the line on monthly dues.
 There is no difference in the present billing system and the new system, except that you will receive your bill from FNB BankAmericard and payments will be sent to the FNB BankAmericard Center. Present FNB BankAmericard holders will automatically receive a new card with the Maxwell-Gunter membership designation. Each active duty NCO who does not already have a FNB BankAmericard will also receive, by mail, his Maxwell-Gunter Non-Commissioned Officers' Club BankAmericard, on or about 26 June 1974. Effective 26 June, 1974, charge purchases will be made on BankAmericard's or white card issued by BankAmericard only, and the present white club card should be destroyed or turned in.
 See attached for questions and answers concerning this system.
Among the questions and answers referred to in the letter were these:
 1. Q-Must all club members make formal applications for credit?
 A-No. Present NCO members (E4 and above with good credit rating) will automatically *Page 1019 
receive their FNB BankAmericard on or about 20 June 1974. All other current members will receive a white club card issued by BankAmericard (FNB) and may apply for regular BankAmericard. Applications may be obtained from either Maxwell or Gunter NCO Clubs, or any First National Bank Branch.
 3. Q-How will I be billed for my monthly dues and charges?
 A-You will receive a bill from BankAmericard each month that will be due 25 days from the date of your statement, however, if you prefer, you may choose to use the revolving account by making a minimum payment and pay the one and one/half percent (1 1/2%) finance
charges on your average daily balance.
4. Q-Can I still pay my bill in cash at the club?
 A-No. You may send a check directly to BankAmericard or pay the teller at the Maxwell First National Bank or any other First National Bank Branch in town.
 13. Q-What if my credit privileges are denied by the club or FNB, or if I decline credit?
 A-You will be issued a white card by FNB with the right top corner cut.
15. Q-When will my dues be posted to my account?
 A-All dues will be posted by BankAmericard prior to the third Tuesday of each month.
 16. Q-When is the last day I can use my present club card to charge?
A-25 June 1974.
 17. Q-When is the last day I can pay my bill at the NCO Open Mess?
A-30 June 1974.
Thereafter, Jakob received his BankAmericard in the mail. Apparently NCO Club dues were charged automatically on the First National BankAmericard (BankAmericard).
After notice of the effective date of the assignment, Jakob attempted to pay his NCO Club dues to the cashier at the club. With the exception of that first attempt, his proffered dues were refused and he was told that they were required to be made to the bank. Jakob wrote a letter in June, 1974, apparently to the NCO Club, stating that he was forced to accept convenience credit to maintain his membership in the NCO Club and that he believed this requirement was illegal. He stated further that he would accept the BankAmericard as a membership identification but would offer his monthly dues to the NCO Club cashier. The record shows that Jakob accepted his BankAmericard for identification purposes to cash checks at the NCO Club.
Beginning in July, 1974 the bank sent Jakob monthly statements of his account. Jakob never paid these statements. In January, 1975 the NCO Club notified the bank that Jakob's club membership was revoked. In March, 1975 when Jakob's account was seven months past due, the bank determined that it was uncollectible and charged it off as a loss. When the accounts charged to the profit and loss statement for that reporting period were reported to the Credit Bureau of Montgomery in March, 1975, Jakob's account was one of those listed. The Credit Bureau then gave a report of Jakob's credit rating to Sears, Roebuck and Company. Jakob alleges, in addition, that about December 1, 1976 a bank employee made a communication to the Credit Bureau that Jakob had a BankAmericard account that was charged off as a bad debt.
In January, 1977 Jakob brought this action against the First Alabama Bank of Montgomery and the Credit Bureau of Montgomery for personal defamation of character and for defamation of his credit reputation. He alleged that the defamations occurred from a false communication and he claimed $50,000.00 in general damages and $500,000.00 punitive damages. After several motions for summary judgment the Credit Bureau was granted its motion; later the bank was granted its motion for summary judgment. Jakob appeals from the summary judgment granted to the bank.
The principal issue raised on appeal is whether or not the trial court erred in granting the bank's motion for summary *Page 1020 
judgment, i.e., was there a scintilla of evidence that there was an actionable defamatory communication, that it was not truthful, not privileged or that actual malice was present?
On appeal the plaintiff insists that there is a scintilla of evidence in the record that about December 1, 1976 an officer, agent or employee of the defendant bank made a slanderous communication to the Credit Bureau. The communication was that Jakob had a BankAmericard account which was charged to the bank's profit and loss statement due to its nonpayment. The plaintiff maintains that this statement was false because the BankAmericard was not an "accepted credit card" under law and therefore, he asserts, he incurred no bona fide debt through it because of his nonpayment of his dues.
The Consumer Credit Protection Act of 1968, 15 USCS § 1602, defined "credit cards" and "accepted credit cards:"
 (k) The term `credit card' means any card, plate, coupon book or other credit device existing for the purpose of obtaining money, property, labor, or services on credit.
 (l) The term `accepted credit card' means any credit card which the cardholder has requested and received or has signed or has used, or authorized another to use, for the purpose of obtaining money, property, labor, or services on credit.
 (m) The term `cardholder' means any person to whom a credit card is issued or any person who has agreed with the card issuer to pay obligations arising from the issuance of a credit card to another person.
The Code of Federal Regulations, 12 Banks and Banking § 226.13, which supplements the statute, mandates that:
 (b) Issuance of credit cards. Regardless of whether a credit card is to be used for personal, family, household, agricultural, business, or commercial purposes, no credit card shall be issued to any person except:
 (1) In response to a request or application therefor, or
 (2) As a renewal of, or in substitution for, an accepted credit card whether such card is issued by the same or a successor card issuer.
This Act was designed to put borrowers in possession of standards by which they could decide for themselves the reasonableness of credit terms so that they could shop for credit more easily. Johnson v. McCrackin-Sturman Ford, Inc.,527 F.2d 257 (C.A.Pa. 1975). The credit cardholder is protected against charges for unauthorized use of his or her credit card, and liability for any unauthorized use is limited to a maximum of fifty dollars. First National City Bank v. Mullarkey, 87 Misc.2d 1,385 N.Y.S.2d 473 (1976). Enforcement of the Act's provisions lies within the authority of both federal and state courts. Lewisv. Delta Loans, Inc., 300 So.2d 142 (Miss. 1974).
We are convinced that Sergeant Jakob's objections to the procedures initiated by the NCO Club, which led to his being billed for dues by the defendant, were made in good faith. Nevertheless, he is mistaken in his view of the character of the BankAmericard in question. There is no question that it was a card within the meaning of § 1602 (k), nor is it questionable that he was a cardholder under § 1602 (m). The record justifies the conclusion, moreover, that his was an "accepted credit card" within the meaning of the statute and regulations. He applied for membership in the NCO Club shortly after arriving at Maxwell, and requested and received membership cards from the Club primarily for the convenience of check cashing, although he occasionally obtained food or refreshments there. The record discloses that he cashed forty-one checks at the NCO Club between March, 1973 and November, 1974. Thus it is clear that he requested and received a Club card which, as a cardholder, was for his purpose of obtaining admission to the Club on a deferred dues-payment basis, and for obtaining other Club services, such as check cashing. This qualified his Club card as an "accepted credit card." Following the billing agreement between the NCO Club and *Page 1021 
the defendant bank, the latter's BankAmericard, with ample notice to Sergeant Jakob, was issued in substitution for his "accepted (Club) credit card" by the bank as a successor card issuer. Thus it was true that the plaintiff had an account with the bank which, because of its nonpayment, was charged off as a bad debt. For this reason alone the trial court's order granting summary judgment was proper. Ripps v. Herrington,241 Ala. 209, 1 So.2d 899 (1941) (truth is a complete defense);Imperial Group, Ltd. v. Lamar Corp., Ala., 347 So.2d 988 (1977) (summary movant must show that other party could not recover under any discernible circumstances).
Having reached the conclusion that summary judgment was proper, it is unnecessary to discuss the other issues raised on appeal. The judgment is affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, JONES and SHORES, JJ., concur.