Appeal from the grant of summary judgment in favor of all defendants. We affirm.
The complaint alleged fraudulent misrepresentations against all defendants arising out of an attempt to effect an insurance adjustment following collision damage to the plaintiff's vehicle. In Count One plaintiff alleged:
. . . .
 4. That on or about the 12th day of May, 1980, Gragg Robinson, an agent of Pritchett-Moore, Inc., while acting within the line and scope of his authority, authorized the Plaintiff to have his automobile repaired and averred that All Risk Insurance Company, the insurance carrier for the automobile driven by Dwayne Richardson, [who allegedly drove the vehicle which negligently struck the plaintiff's vehicle] would remit a check . . .
 5. The representations made by the Defendant, Pritchett-Moore, Inc., by their agent, Gragg Robinson and by the Defendant, All Risk Insurance Company, through their agent, Pritchett-Moore, Inc., were false and the Defendant, without knowledge of the true facts, recklessly misrepresented them, or in the alternative, were made by mistake, with the intention that the Plaintiff should rely upon them.
 6. That the Plaintiff believed the representations and in reliance thereupon, had his automobile repaired and expended the sum of Four Hundred Thirty-Six and No/100 ($436.00) Dollars for this repair. *Page 754 
Count Two adopted paragraphs 1 through 6 of Count One and added:
 2. Subsequent to the repair of the Plaintiff's automobile, the Defendant, Crawford Company, while acting in concert with the Defendants, Pritchett-Moore, Inc., and All Risk Insurance Company, Inc., undertook to appraise the damages sustained by the Plaintiff's automobile.
 3. That at the time of the said appraisal, the Defendant Crawford Company knew or had reason to know that the Plaintiff had expended the sum of Four Hundred Thirty-Six and No/100 ($436.00) Dollars for the repair of the damages sustained by the Plaintiff's automobile.
 4. That at the time of said appraisal, the Defendant, Crawford Company knew or had reason to know that the Plaintiff had at the request of the Defendant, Pritchett-Moore Inc., obtained various estimates for the repair of the damages sustained in the accident ranging from Four Hundred Thirty-Six and No/100 ($436.00) Dollars to Seven Hundred Fifty-One and No/100 ($751.00) Dollars and knew or had reason to know that these estimates represented fair and reasonable charges for the repair of the damages sustained by the automobile.
 5. That subsequent to the aforesaid appraisal, the Defendant, Crawford Company appraised the damages to the Plaintiff's car at One Hundred and No/100 ($100.00) Dollars, knowing or having reason to know that the damages sustained by the aforesaid automobile were much more expensive.
 6. That the aforesaid appraisal was made solely for the purpose of defrauding the Plaintiff.
The plaintiff claimed $436.00 actual damages and $10,000.00 punitive damages from both Pritchett-Moore and All Risk Insurance Company jointly, and the same amounts from Crawford and Company individually. By amendment the punitive damages claim was increased to $100,000.00. All defendants filed answers. Thereafter the defendants moved for summary judgment: Pritchett-Moore's motion being based upon the pleadings, the plaintiff's deposition, the plaintiff's answers to interrogatories of All Risk and Crawford and Company, and documents produced by the defendants in response to plaintiff's requests for production; All Risk and Crawford and Company relied upon the pleadings, the plaintiff's deposition and the plaintiff's answers to interrogatories. Following a hearing on these motions the trial court granted the motions, and the plaintiff appealed.
Whether summary judgment was proper as to each defendant is the question before us.
It is important to test the evidence before the trial court with the principles of law upon which the plaintiff was relying. Under the allegations of the complaint it is apparent that plaintiff was relying upon Code of 1975, § 6-5-101:
 Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud.
Under this principle there must be (1) a false representation (2) concerning a material existing fact (3) relied upon by the plaintiff (4) who must be damaged as a proximate result.International Resorts, Inc. v. Lambert, Ala., 350 So.2d 391
(1977) and cases cited.
The evidence establishes that the plaintiff's pick-up truck was damaged by another automobile driven by one Dwayne Richardson. The plaintiff ascertained at the scene that Richardson's insurance agency was Pritchett-Moore, Inc., and that Richardson's agent was one Gragg Robinson. The next morning he went to see Robinson:
 I told him what had happened and he got the secretary to pull the man's record. And we talked about it a few minutes. Then he told me to go out and get some estimates, which I did. *Page 755 
The agent had told plaintiff to obtain two estimates; however, he actually obtained three, one each from Campbell's Body Shop, the "Buick place," and Horton's Garage. He delivered two of these to the agent, the Campbell's and Buick estimates. The plaintiff deposed further:
Q And you turned them in to him?
A Yes, sir.
Q And what did you all say or agree you'd do? What was your understanding about what was going to happen next?
A Well, I believe that I asked him about, you know, about how long it would take to settle and he said he didn't think it would take long.
Q Did he tell you someone would be in touch with you?
A He said that the insurance company should get with me in about a week.
Q In other words, you understood that he was going to send these estimates to the insurance company?
A Right.
Q And he said that someone representing the insurance would be in touch with you in about a week?
A Right.
Q Did he say who he thought that might be?
A No, sir, he didn't say.
Q Did he indicate it would be someone other than himself, though?
A He didn't say, sir. I assumed he meant someone else, I didn't know.
Q Did you ever have any further conversations or dealing with Mr. Robinson?
A I did ask him about going ahead and getting my truck fixed. He said go ahead and have it fixed.
Q When was this that you all had that conversation?
A The same day, sir.
Q You asked him if you could go ahead and have it fixed?
A I asked — He said it would take about a week. I said, "Well, would it be all right if I go ahead and put my truck in the shop?" He said, "I see no problem there."
Q Well, let's focus in on that conversation, then, to try to pinpoint exactly what was said. Was this before or after he's told you that someone from the insurance company would be in touch with you in about a week?
A Best I can remember, it was after.
Q Okay. And you, then, brought up the idea: Could you go ahead and put your truck in the shop?
A Right. Because I had a specific reason why.
Q And what was that?
A I had to be in Mississippi the following weekend for Guard drill. They have some regulations on entering a military post about damaged vehicles.
Q And did you tell that to Mr. Robinson?
A Yes, sir.
Q All right. And — Strike that.
 And he simply said — Well, tell me. You said, "Can I go ahead and put it in the shop?"
A Yes, sir.
Q And what did he say in response to that?
A He said, "I don't see any problems if you need the truck."
Q He said, "I don't see any problem if you need the truck?"
A Right.
Q Now, I think I asked a minute ago, but to make sure before I move on to something else: Did you have any further dealings with Mr. Robinson that you can recall?
A At this time?
Q Well, I guess at any time along.
A I'm trying to think whether I got the letter from All Risk before I called him back or not. I'm going to say no but I'm not sure. I don't believe we did.
Q Okay. What's the next thing that happened then? Did you take your truck and put it in the shop?
A Yes, I took the truck and put it in the shop. *Page 756 
Q Where did you put it?
A Put it in Allen's Body Shop.
Q And why did you put it in Allen's Body Shop?
A Because I asked him about getting — He works with Horton's Body Shop. And I asked him, I said, "Campbell looks like they're pretty snowed under up there. I need my truck this week." So I asked him, I says, "Will you fix the truck here at Horton's for what Campbell's would? "Yeah," said, "we'll fix it for a dollar less." And he gave me an estimate. I said, "Well, will that be permissible with the insurance company?" He said, "I don't see why not. You turned in the cheapest estimate." I said all right.
Q Now, I assume that when you had the conversation you've already testified to about — with Mr. Robinson; that is, you wanted to know if you could put it in the shop, you didn't tell him which shop you were planning on putting it in?
A No. I didn't have any idea at that time which shop I was going to put it in.
Q So he had no idea that you might be taking it to Horton's or what Horton might fix it for or what Mr. Allen might fix it for?
A What he told me was — I asked him, I said, "Well, I need to get my truck fixed." He said, "Well, the insurance company will pay the amount of the lowest estimate." That was my understanding.
Q All right. Well, did he make a definite absolute binding commitment to you: Don't worry, they're going to pay the lowest estimate no matter what? Or was it as you said earlier, he said the insurance company would be in touch with you in about a week?
A He said the insurance company will take care of it. I told him; turned in the cheapest estimate. He said that sounded fair.
. . . .
Q As I understand it, you had to have this truck fixed by that time.
A Well, it was the only way I could get to Mississippi.
Q Right. In other words, you had no choice in the matter.
A Right.
Q One way or the other, whether the insurance company was going to pay for it or not, you had to get your truck fixed.
A Right.
Q And if Mr. Robinson had told you "Don't have it fixed," or "the insurance company ain't going to pay for it," or "Mr. Richardson's insurance is void" — No matter what he told you, you were still going to have to get that truck fixed.
A I was going to pay to have the truck fixed myself. I paid to have the truck fixed myself.
Q All right, sir. So his telling you that as far as he was concerned, you could go ahead and put it in the shop, really didn't influence you one way or the other in that?
A No. Because I assume that when a man has insurance, I assume his insurance will pay off if he's liable.
Q Well, I understand that. But I'm just saying that from what you've told me, it seems to be that regardless of what Mr. Robinson might have ever said to you, you were going to have to have the truck fixed anyway by that Friday?
 MR. LEWIS: We object to the form of the question and object to leading.
MR. JENKINS: You can answer, Mr. Earnest.
Q Do you understand my question?
A Yeah, I understand your question. I needed my truck.
Q And you were going to have to have it fixed by that Guard drill?
A I needed to go to Mississippi. I had tried to make arrangements to get out of going, yes.
Q And if you went, the truck, you're saying, was the only way of going.
A It was the only way I could go Saturday morning. *Page 757 
Q All right. And you had —
A Sunday morning. I'm sorry. I made a mistake.
Q And you had to go Sunday morning.
A Yes, sir. We have to fire — We have to qualify with the rifles once a year; mandatory, Alabama National Guard.
Q And you say you had the money yourself to pay for it and you did in fact pay for it?
A I did pay for it. That's correct.
Q Well, what if Mr. Robinson had told you they probably won't pay for it. This man has such a bad driving record, there probably won't be any insurance. Would you still have had to have the truck fixed by that Sunday?
A I would have had my truck fixed and hired me a lawyer and sued Dwayne Richardson.
Q All right, sir. Fine. By the — at the time you got your truck back Friday morning, had you had any contact or communication with Mr. Robinson other than those two conversations you have already told me about?
A Not that I remember.
He added:
Q At no time did Mr. Robinson ever know that you were planning on having Mr. Allen fix your truck, did he?
A He never did ask me.
Q Well, do you know of any other way he would have known it?
A (Shakes head.) I didn't see any reason —
Q Well, let me rephrase it this way — and I'm not trying to trick you, I'm just asking factually.
 As far as you know, did Mr. Robinson ever have any knowledge of the fact that you were going to have your truck fixed by Mr. Allen or how much Mr. Allen was going to fix it for?
A No.
MR. HARWOOD: That's all.
(Examination by Mr. Harwood continuing:)
A The question was that I asked him about it and he said get the truck fixed.
Q You asked Mr. Robinson about it?
A Yes, sir. He said he didn't think we'd have any problem other than he did say he wanted to call Mr. Richardson up first on one of the first conversations to see if he wanted to take care of it his-self.
Q All right. But insofar as him saying he didn't see that there'd be any problem about it, you then asked him during the conversation — or explained to him — that you had to have your truck by Friday.
A Told him I needed my truck by — by the weekend.
Q You asked him could you go ahead and put it in the shop?
A Right.
Q And he said he didn't see any reason why not?
A Right.
Q Did he tell you that he was sure the insurance company would pay that estimate?
A No, sir.
Q Did he just tell you they usually pay the lower estimate?
A He said the insurance company usually pays the lowest estimate.
Q But that somebody from the insurance company would be in touch with you about it?
A He said, "You should hear from the insurance company in about a week."
Under the evidence of the plaintiff himself it is difficult to establish a misrepresentation of a material fact which induced the plaintiff to act. The agent made no representation that the plaintiff would be paid in any event, only that the insurance company usually paid the lowest estimate. Additionally, the evidence establishes that the moving inducement for the plaintiff's having his truck repaired was not any statement made by the agent but because, at all events, he needed the use of the truck the next weekend. Whether the insurance company was to satisfy his claim or not, he incurred the repair bill with another and *Page 758 
different garage on his own terms. The alleged misrepresentation, therefore, did not materially contribute to his damage and was not "of such character that the purchaser would not have consummated the contract [of repairs] had he known the falsity of the statement." Southern Loan Trust Co.v. Gissendaner, 4 Ala. App. 523, 58 So. 737 (1912), quotingJordan Sons v. Pickett, 78 Ala. 331 (1884).
We conclude that summary judgment was appropriately entered for Pritchett-Moore.
The same considerations apply to All Risk. The agent Robinson, from aught that appears, was acting as a conduit for estimates of repair to be transmitted to the appropriate liability carrier. All Risk came into the situation after plaintiff had had his truck repaired. He received a letter from Al Hollingshead, a representative of All Risk, together with a form which plaintiff completed and returned by mail. Plaintiff also telephoned Hollingshead and discussed the accident and the contents of the form. Hollingshead stated to plaintiff in that conversation: "Well, James, if we have any problem, I'll be sure and call you." After that conversation and before any further contact with Hollingshead, plaintiff paid Allen's garage the amount of his repair bill. Later he telephoned Hollingshead again and was told that more paperwork was required. Still later he telephoned Hollingshead and was told that Crawford and Company would handle the adjustment. These communications only revealed that All Risk required additional information, and that Crawford and Company would adjust the claim. All Risk itself made no false representation to the plaintiff and plaintiff acted on none to his damage. Indeed, plaintiff did not act upon any statement made to him by Hollingshead or anyone in the latter's office. And if plaintiff's theory is that Robinson, the agent, was acting for All Risk, we have shown by the evidence adduced that plaintiff acted for reasons personal to himself in having his car repaired, not from anything Robinson represented to him.
Insofar as plaintiff's transaction with Crawford and Company is concerned, plaintiff's evidence is:
A All right. The second time I called him, he said, "We have turned it over to Crawford and Company. They will make the adjustment." All I know is Crawford and Company is insurance adjuster. I didn't know what they do. I mean for that point.
Q Well, do you recall anything else that was said between you —
A That's what I'm getting to now.
Q Okay.
A He said — Now, I can't remember exactly the man's name who's in charge of Crawford and Company. Is it Mr. Poole? He's the manager — whatever.
Q All right.
A The manager: He was the one that I was to contact. He called me and he said Buddy Latham was to —
Q Mr. Poole called you?
A Yes, sir.
Q Now, when was this —
A No, I called Mr. Poole. He told me to call Mr. Poole.
Q And when was this that you called Mr. Poole?
A I believe I called him the same day.
Q Okay. The same day that you had this second call to Mr. Hollingshead?
A And he said Buddy Latham would get back with me on it. All right. Buddy called me, we talked a little bit —
. . . .
Q All right. And what conversation took place between you and Mr. Latham?
A All right. He called me on the telephone and told me who he was. Said he was representing Crawford and Company. And he asked me where I lived and I told him.
. . . .
 And he said, "Well," said "What day can I get with you and talk about getting your truck fixed?" I said I'd already had my truck fixed. "Oh," he *Page 759 
said, "that brings up another problem, then. I'll have to get back in touch with Hollingshead."
 So he said he was going to get back in touch with Birmingham again. Said, "We'll get back with you."
 So, finally a week or so, I guess, passed — somewhere around in there. It was a Friday morning. They called and wanted me to bring the truck down there. I told them I'd be working day shift. He said, "Well, let your wife bring it down. Let us look at it." I said, "Well, I don't see any problem." So we agreed to meet about 9 o'clock.
. . . .
 So I went on and went down there. Well, this Mr. Poole — whoever it is — he came in that morning and we talked for a few minutes and he had me sitting back there in the office. Well, he didn't ask me any more questions other than he said the adjuster was out.
Plaintiff then testified that while he was waiting in the office of Crawford and Company he saw someone outside looking at his truck and when he went outside he discovered that it was an employee of Campbell Body Shop. He telephoned Hollingshead and the latter offered him a settlement of $100.00 which he refused.
None of that evidence produces any inference of a misrepresentation made to plaintiff by any of the Crawford and Company representatives, Poole, Latham or anyone acting for them. Nor did plaintiff himself relate any such misrepresentation. Doubtless plaintiff felt imposed upon by what he obviously considered needless delays; nevertheless he has not furnished evidence of either a misrepresentation by Crawford and Company or his own reliance upon any such misrepresentation. In fact his evidence affirmatively discloses that his alleged injury occurred before he had any contact with Crawford and Company.
The party moving for summary judgment has the burden of showing that the other party could not recover under any discernible circumstances. Jakob v. First Alabama Bank ofMontgomery, Ala., 361 So.2d 1017 (1978); Folmar v. MontgomeryFair Co., Inc., 293 Ala. 686, 309 So.2d 818 (1975). Our careful review of the evidence has convinced us that the defendants have met their burden. There was not a scintilla of evidence before the trial court on the elements of misrepresentation by any of these defendants or reliance thereupon by the plaintiff. It follows that the trial court's grant of summary judgment in their favor was proper. That judgment, therefore, must be and is affirmed.
AFFIRMED.
TORBERT, C.J., and JONES and SHORES, JJ., concur.
MADDOX, J., concurs in the result.