The issue before the Court in this case is whether the trial court erred in granting summary judgments in favor of defendants John Garner, Orleane Garner, Waymon Rutherford, Rutherford Insurance Agency, Inc., L.E. Rife, Inc., and Casualty Indemnity Exchange, Inc. We affirm.
The undisputed facts show the following: John Garner and his wife, Orleane Garner, purchased a cafe from MJM, Inc. George Blankenship represented MJM in the sale negotiations, in conjunction with Horace Culpepper, a real estate agent. Pursuant to the sale, the Garners assumed existing mortgages on the cafe which were held by Security Mutual Finance, Inc., and Cullman Savings and Loan Association. They executed two notes secured by two mortgages and a security interest to MJM for the balance of the purchase price. One of the notes was secured by a mortgage on real property which the Garners owned in Jefferson County. The other note was secured by a mortgage on the cafe. MJM received the security interest in the personal property sold in conjunction with the cafe.
Subsequent to the sale, Blankenship obtained a loan on behalf of MJM from Parker Bank and Trust company. As collateral securing this loan, MJM, through Blankenship, conditionally assigned the Garner notes and mortgages to Parker Bank and Trust Company. Culpepper and Clyde White also signed as guarantors on this loan. According to its terms, the assignment was to become absolute and irrevocable without notice to MJM if it defaulted.
Culpepper contacted Waymon Rutherford (of Rutherford Insurance Agency, Inc.) to secure insurance on the cafe for the Garners. Rutherford acts as a general agent for several insurance companies and also brokers coverage with other companies. Rutherford arranged coverage for the Garners with Casualty Indemnity Exchange (C.I.E.) through L.E. Rife, the general agent for C.I.E. Rutherford had no authority to bind C.I.E., in contract. L.E. Rife bound coverage for the Garners on April 22, 1981. In early May, Rutherford received the policy of insurance on the cafe. Cullman Savings and Loan was the only loss-payee listed on it. When Blankenship discovered that MJM had not been listed on the policy as a loss-payee, he obtained partial coverage for MJM through Aetna Casualty and Surety Company.
On May 18, 1981, Rutherford contacted L.E. Rife concerning the mortgages held by Security Mutual Finance, Inc., and MJM and also concerning the fact that he had not been able to locate the Garners to deliver the policy. Prior to this time, neither L.E. Rife or C.I.E. had had any notification of the existence of these two additional mortgages. L.E. Rife initiated cancellation of the policy. Prior thereto, the Garners had indicated to Blankenship that they were dissatisfied with the purchase of the cafe and were closing it. On June 7, 1981, the cafe was damaged by fire and Aetna paid MJM's claim. When its note with Parker Bank and Trust came due, MJM used a portion of the Aetna proceeds to pay back approximately one-half of its loan and renewed the note for the balance. When the note again fell due, MJM defaulted. Culpepper and White, as guarantors, paid the note upon demand and took the Garner notes and mortgages by way of assignment from Parker Bank and Trust.
The procedural history of this case is somewhat involved. For purposes of our determination, however, suffice it to say that MJM intervened in a suit previously *Page 1139 
brought by the Garners against Rutherford, Rutherford Insurance Agency, L.E. Rife, and C.I.E. claiming breach of an insurance contract and bad faith refusal to pay. In its complaint in intervention, MJM alleged breach of contract against the Garners, as well as breach of contract, fraud, and bad faith refusal to pay against the remaining defendants. Aetna intervened as a subrogee to any recovery by MJM on the basis of its payment of MJM's claim for fire loss pursuant to its policy.
Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Rule 56 (c), Ala.R.Civ.P. All reasonable doubts concerning the existence of a genuine issue of fact must be resolved against the moving party. Fountain v. Phillips,404 So.2d 614 (Ala. 1981).
MJM contends that the trial court erred in granting a summary judgment on its claims against the Garners for breach of contract. It first argues that the Garners are in breach of contract by failing to pay the two notes which they executed in connection with the purchase of the cafe. We disagree.
The undisputed facts in this case show that MJM conditionally assigned the Garner notes to Parker Bank and Trust as collateral for a loan. According to its terms, the assignment became absolute and irrevocable upon MJM's default. Culpepper and White, the guarantors of that loan, repaid it and took the Garner notes by way of assignment from Parker Bank and Trust. Section 8-3-2, Code 1975, reads as follows:
 "A surety who has paid his principal's debt is entitled to a transfer of the original and collateral security which the creditor holds; he has all the rights to realize thereon and to reimburse himself to the same extent as the creditor might have done before the surety paid him, whether paid before or after judgment; and he shall be substituted for the creditor and subrogated to all his rights and remedies; in effect, he shall be a purchaser of the debt and all its incidents."
The term "surety," as used in this section, means one who has been forced to pay a debt which was the primary obligation of another and which the latter ought to have paid in exoneration of the former. Bradley v. Bentley, 231 Ala. 28, 163 So. 351
(1935).
As a result of its default on the note to Parker Bank and Trust and the subsequent assignment of the Garner notes to Culpepper and White, MJM lost its interest in the cafe. Therefore, it has no right to enforce payment of the Garner notes. Culpepper and White became subrogated to that right and the Garners' obligation to pay that debt is to them, not MJM.
MJM insists that a question of fact was presented in Blankenship's affidavit submitted in opposition to the various motions for summary judgment, namely a question as to whether Culpepper was acting as its agent when he paid the note to Parker Bank and Trust and accepted the assignment of the Garner notes for MJM in that capacity. Again we disagree.
That affidavit, in pertinent part, reads as follows:
 "Further, I never knew that I could lose my mortgage interest in the property. All of this was under the advice of my real estate agent, Horace Culpepper, acting in his fiduciary capacity. I made the first payment of the note for MJM as Culpepper advised as my real estate agent. When the next payment on the note came due, neither I nor MJM could pay the balance on the note because Culpepper, while acting as my real estate agent and in a fiduciary capacity as such, negotiated the sale of the Peddler's Cafe and requested that only $5,000.00 be paid down, which he kept. This turned out to be poor advice from my real estate agent and caused me to be in such financial straits that I could not afford to pay the balance, all of which Culpepper knew. When the balance came due on the note, I thought since the unsoundness of the entire transaction was his fault and since he had gotten part of the money out of *Page 1140 
the $40,000.00 borrowed at Parker Bank, that he was making the payment for the benefit of MJM and Culpepper Real Estate. Culpepper was fully aware of the financial problems so he went and paid on the note in his fiduciary capacity as real estate agent. My understanding was that since he was my real estate agent, he was doing this in my behalf so that when Culpepper took assignment from the bank of the mortgage and note, it was to be for the benefit of MJM and Culpepper Real Estate. I, therefore, own an interest in the note and mortgage assigned to Culpepper Real Estate.
 "Previous to Culpepper ever making a payment on the note to Parker Bank, I made, on behalf of MJM, a payment of approximately one-half of the indebtedness, due to the fact, and regardless of what Culpepper did subsequently, I owned an equitable one-half interest in any notes and mortgages assigned by the Parker Bank to Culpepper. Culpepper, nor anyone else, can assign my one-half interest in and to this said note and mortgage. I deny that he owns the notes and mortgages in their entirety as he and I had an understanding that he was holding them for the benefit of MJM and himself. Further, Culpepper was acting as my real estate agent and fiduciary when he made this last payment to Parker Bank and took this assignment. This note and payment of same, all being the one transaction, namely, the sale of the Peddler's Cafe. I had paid one-half of the note so I owned a portion of the note and mortgage assigned to Culpepper. If Culpepper did pay and take assignment solely in his own behalf, then he did so fraudulently and breached his fiduciary duty.
". . .
 "In all of the dealings on this sale of the Peddler's Cafe property, I was under the impression that Mr. Culpepper was always acting on my behalf as real estate agent. However, it has come to light, particularly in these years since this lawsuit has been filed, that Mr. Culpepper has not always been acting according to his fiduciary duties. This is particularly reflected in Mr. Culpepper's action of making the second payment on the note and then taking assignment in his own name from the bank on the mortgage and note which I had paid on already. I was always under the impression from Mr. Culpepper's dealings with me that he would be up front and fair as would only be expected of one with fiduciary duties as he had as real estate agent. The obvious result of this was that neither I nor MJM could have ever known that MJM's right under the mortgage or note could be severed by any action taken by Culpepper. After all, it was my mortgage and note. Culpepper and Clyde White had only signed as guarantors. I never knew that any action taken by Culpepper such as his taking assignment of the notes would mean that MJM's interest would be dissolved."
Under Rule 56 (e), Ala.R.Civ.P., an opposing affidavit must be made on personal knowledge, and must set forth facts that would be admissible in evidence and show affirmatively that the affiant is competent to testify to the matters stated. In Dayv. Merchants National Bank of Mobile, 431 So.2d 1254 (Ala. 1983), the Court, quoting from Butler v. Michigan MutualInsurance Company, 402 So.2d 949 (Ala. 1981), stated:
 "`It is the rule that when a motion for summary judgment is made and is supported as provided in Rule 56, Alabama Rules of Civil Procedure, a party adverse to such a motion may not rest upon the mere allegations or denials of the pleadings and must submit facts controverting those facts presented by the moving party. Imperial Group, Ltd. v. Lamar Corp., 347 So.2d 988 (Ala. 1977); Ray v. Midfield Park, Inc., 293 Ala. 609, 308 So.2d 686 (1975); Glover v. Merchants Adjustment Service, 57 Ala. App. 62, 326 So.2d 129 (1976). Likewise, the affidavits must be made on personal knowledge and must set forth facts to show that the evidence would be admissible as testimony to contradict the movant's evidence. *Page 1141 Arrington v. Working Woman's Home, 368 So.2d 851
(Ala. 1979); Oliver v. Brock, 342 So.2d 1 (Ala. 1976). The scintilla rule cannot be satisfied by speculation and the evidence presented must be supported by at least a reasonable inference. Arrington v. Working Woman's Home, 368 So.2d 851
(Ala. 1979); Oliver v. Brock, 342 So.2d 1 (Ala. 1976).'"
In the present case, Blankenship states in his affidavit that he "thought," was "under the impression" or it was his "understanding" that Culpepper was acting as MJM's agent when he paid the note to Parker Bank and Trust and accepted the assignment of the Garner notes. Subjective beliefs, such as these, no matter how sincere, are not the equivalent of personal knowledge and such statements relating thereto do not satisfy the requirements of Rule 56 (e), supra. Oliver v.Brock, 342 So.2d 1 (Ala. 1976).
Having reviewed the record, and finding no genuine issue of material fact in this regard, we hold that the trial court properly granted the Garners' motion for summary judgment.
MJM next argues that the Garners breached their agreement to obtain hazard insurance on the cafe for the purpose of protecting its mortgage and security interests.
The mortgage executed by the Garners to MJM securing one of the notes expressly obligated the Garners to procure hazard insurance on the cafe sufficient to protect MJM's interests. All of the oral negotiations concerning this obligation would have merged into the mortgage upon its execution, Guilford v.Spartan Food Systems, Inc., 372 So.2d 7 (Ala. 1978). Therefore, MJM's cause of action against the Garners for failure to procure the hazard insurance arises out of the mortgage.
A cause of action arising out of a breach of contract is assignable in Alabama. Section 8-5-20, Code 1975, reads as follows:
 "All bonds, writings and contracts for the payment of money, or other thing, or the performance of any act or duty, are assignable by endorsement so as to authorize an action thereon by each successive endorsee."
See also Crawford v. Chattanooga Savings Bank, 201 Ala. 282,78 So. 58 (1917).
MJM assigned its mortgage by endorsement thereon to Parker Bank and Trust. The endorsement reads:
 "For value received, the undersigned MJM Corporation, Inc. hereby sells, assigns and conveys to Parker Bank and Trust Company all of its right, title and interest in and to the foregoing mortgage, and the real estate encumbered thereby, and guarantees that the face amount of the note is due thereunder, and that there are no credits or offsets against same."
Because of MJM's default, the assignment to Parker Bank and Trust became absolute and irrevocable. Consequently, MJM lost its right of action under the mortgage and, thus, the trial court did not err in granting the Garners' motion for summary judgment.
MJM's claim of fraud against the remaining defendants is based upon alleged willful or reckless misrepresentations of coverage by Rutherford. MJM contends that Rutherford was acting as an agent for L.E. Rife and C.I.E. and, in that capacity, made false assurances that MJM was covered under the policy as a loss-payee.
Under the allegations of its complaint, it is apparent that MJM is relying upon § 6-5-101, Code 1975:
 "Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud."
A necessary element of fraud under this section is reasonable reliance. Earnest v. Pritchett-Moore, Inc., 401 So.2d 752 (Ala. 1981). Where a party has reason to doubt the truth of the representations or is informed of the truth before he acts, he has no right to act thereon. Mahoney v. Forsman, 437 So.2d 1030
(Ala. 1983). *Page 1142 
Blankenship's undisputed testimony on deposition was as follows:
 "Q. All right. Now, there are some few days then before the fire that you were aware of the fact that MJM., Inc. and Security Mutual were not listed as a loss-payee on that policy?
"A. Yes, on the policy that he showed me.
 "Q. All right. And you say he showed you that particular policy some four or five days before the fire?
"A. I don't know how long it was.
 "Q. All right. In your judgment, how long before the fire was it before you learned that M.J.M., Inc. was not a loss-payee on the policy that he showed you? In your judgment, how many days, four or five?
A. Yes, that or more.
 Q. All right. Now, as soon as you ascertained that M.J.M., Inc. was not on that policy as a loss-payee did you go to Ed Harbison's office?
"A. Right.
"Q. On that same day?
"A. Right.
"Q. In your judgment —
 "A. I'm not not sure whether it was the same day or the next day. It seemed like Ed was out that day.
 "Q. In your judgment, was it either that same day or the following day?
"A. Right.
 "Q. Did you at that time procure insurance on the same property, the Peddler's Cafe and the buildings there?
 "A. I asked Ed if he could get me some kind of insurance since I was unsure if M.J.M. was covered and that Rutherford assured me that we were but I wasn't completely satisfied in my mind on the coverage we had and if there was a possibility that he could get some kind of partial coverage and he said that he thought he could and he subsequently did.
"Q. Did he get coverage?
"A. Yes, he got partial coverage.
"Q. And what was the amount of that coverage?
"A. I believe about $77,000.00.
"Q. About $77,000.00?
"A. I believe.
 "Q. And did you sign on the day that you were there, either the day that you found out about the policy that Mr. Rutherford had or the following day, did you on that occasion sign an application?
"A. With Harbison?
"Q. Yes, sir.
"A. I suppose I did.
 "Q. All right. And based upon that application did you later receive a policy?
"A. Yes.
"Q. After the fire did you collect on that policy?
 "A. Yeah. We collected $77,000.00 or whatever it was. It was seventy-something.
"Q. And that was from Aetna?
"A. Aetna.
". . .
 "Q. You said in your conversation with Mr. Harbison that you got partial coverage on this when you found out you didn't have any coverage or you were worried about it. What did you mean by partial coverage?
 "A. Well, I didn't want to go to the expense of paying several thousand dollars for full coverage on a piece of property and it wasn't in my name or anything. I wasn't even sure I could get any insurance since the property was sold to the Garners and they had already made a deed, you know, we had already made a deed out to them and everything. That's the reason I asked him if we could and he told me he thought he could and he did.
 "Q. What did you have coverage on? What did the policy say?
"A. I don't know.
"Q. Contents?
"A. Contents, I suppose, and the building.
 "MR. PETTIT: Here's a copy of the policy (indicating). *Page 1143 
 "Q. And you decided not to take out full coverage on it because of the amount of your premium?
"A. Right.
"Q. You could have done that nonetheless?
 "A. I don't know if I could or not but I didn't want to.
"A. But it was your decision?
". . .
 "A. I just got through telling you, I didn't want to take out full coverage on it because of the cost of the policy.
". . .
 "Q. . . . Now, let me ask you this: You know, I can sort of half way understand you wanting to have partial protection for $77,000.00 for 29, 30 but is there a reason why you did not go to full protection? I mean, the premium is $2,900.00 on it.
 "A. Yeah, on this amount. And the full premium would have been about twice or better on that, the full amount of the property and I felt like that in the long run that we were covered but I just wasn't sure and I had — it's like playing poker, you know, and I want to cover some of it.
"Q. But the binder you had seen did not list you?
 "A. No. But I had no reason to disbelieve Rutherford.
 "Q. Well, you must have because you went and got other coverage, other insurance.
 "A. Well, I just wasn't a hundred percent sure. I wouldn't trust him all the way, let's put it that way."
The foregoing portions of Blankenship's deposition established that once he learned that MJM had been omitted from the policy, he did not reasonably rely upon any alleged misrepresentations by Rutherford.[1] Blankenship was fully aware that MJM was not designated on the insurance policy as a loss-payee and, consequently, he obtained other coverage through Aetna. This result is not altered by the fact that Blankenship failed to secure adequate coverage through Aetna. His failure in this regard resulted from a conscious decision to avoid the expense of full coverage. The summary judgments on the fraud claims were, therefore, proper.
Finally, the summary judgments were proper as to MJM's claim of damages for failure to pay on the insurance contract and bad faith against Rutherford, Rutherford Insurance Agency, L.E. Rife, and C.I.E. A party seeking to prove a bad faith refusal to pay on a contract of insurance must necessarily show that there was an insurance contract. National Security Fire andCasualty Co. v. Bowen, 417 So.2d 179 (Ala. 1982).
Our review of the record, in the instant case, reveals no evidence that a contract of insurance, naming MJM as a loss-payee, ever came into existence between either the Garners or MJM and C.I.E. Rutherford, acting as an independent insurance broker, was the sole intermediary when he arranged coverage for the Garners through L.E. Rife. The undisputed facts show that prior to May 18, 1981, neither L.E. Rife nor C.I.E. had had any notification as to MJM's mortgage interest. To the contrary, L.E. Rife initiated cancellation on that date upon learning of the additional mortgages and the fact that Rutherford could not locate the Garners to deliver the policy.[2]
Rutherford, acting as an independent broker, had no authority to bind C.I.E. in contract.[3] Washington National *Page 1144 Insurance Company v. Strickland [MS. 84-483, December 20, 1985] (Ala. 1985). Therefore, any alleged assurances of coverage which he might have made to Blankenship are not evidence of a contract between MJM and C.I.E., and, furthermore, there is no evidence of any communication between Blankenship and either L.E. Rife or C.I.E.
AFFIRMED.
TORBERT, C.J., and FAULKNER, ALMON and BEATTY, JJ., concur.
[1] Although Blankenship alleges in his deposition that Rutherford made certain misrepresentations of coverage prior to the issuance of the policy by C.I.E., MJM cannot recover in fraud based upon those alleged misrepresentations because there is no evidence in the record that Blankenship relied on them to MJM's detriment. Earnest v. Pritchett-Moore, Inc., supra.
[2] This would preclude any recovery in contract against L.E. Rife and C.I.E. on the part of MJM under any third-party beneficiary theory.
[3] As an independent broker, Rutherford was, in fact, acting as agent for the Garners by soliciting coverage for them.Washington National Insurance Company v. Strickland [MS. 84-483, December 20, 1985] (Ala. 1985).
Consequently, he cannot be held personally liable for failure to pay on the insurance contract. See Highlands UnderwritersInsurance Company v. Eleganté Inns, Inc., 361 So.2d 1060 (Ala. 1978), for a statement of law with regard to the duty that insurance agents or brokers owe to their principals, the insureds.