Appeal by Harry Mitchell, plaintiff, from a summary judgment in favor of Southern Guaranty Insurance Company (Southern Guaranty) and others, defendants, in plaintiff's action based upon fraud. We reverse and remand.
Plaintiff Mitchell had obtained an insurance policy containing collision coverage from Southern Guaranty on a 1983 Chevrolet pickup truck. On August 22, 1984, this truck was involved in a collision with another vehicle. We quote from Mitchell's deposition concerning his subsequent contact with Southern Guaranty's agent, Randy McDonald:
 "Q. What, if anything, did you do with respect to your insurance policy or make any claim on your policy?
 "A. I went over and talked to Randy and told him what had happened.
". . . .
 "Q. What, if anything, did you tell Randy or what business did you transact with him?
 "A. I told Randy what had happened and Randy suggested to me, since it was the lady's fault for me to try to collect the money from her.
 "Q. Randy McDonald is your local agent that issued this Southern Guaranty policy?
"A. Yes, sir.
 "Q. What did you say or do when Randy suggested that you try to collect it out of the lady?
 "A. I told him that I would. I went down to my dad's the next day and me and him went and saw the lady.
". . . .
"Q. What did you find out?
 "A. She was about eighty-two years old and she was living off Social Security and I said that I wasn't going to hound her. I paid my insurance for that reason. I come [sic] back and told Randy, I said Randy, I'm getting my truck fixed and if you can collect for me, that is fine and good.
 "Q. What, if anything, did Randy say on that occasion?
"A. He told me to go ahead and get my truck fixed.
". . . .
 "Q. Did he tell you to get any estimates made on it?
"A. Well, I had taken him two estimates over there.
 "Q. When had you done that, taken him the estimates?
 "A. I guess the day that he suggested, the day after he suggested that I try to collect from the lady that hit the truck.
". . . .
"Q. Where on the truck was the damage?
 "A. It was on the driver's side on the back quarter panel.
 "Q. Was it a tear or rip or how would you describe the damage?
 "A. I can't remember if it was ripped. I know that it was folded back.
 "Q. What, if anything, did you do after taking the two estimates to Randy and Randy telling you to get it fixed?
 "A. Well, I just went and told Kenneth [Turberville] to go ahead and get the parts, that Randy had said go ahead and get the truck fixed.
 "Q. How many days was this after the damage to the truck?
"A. It must have been four or five days.
 "Q. At the time you got Turberville to make the estimate for you, did you tell him at that time to go ahead and order any parts for the repair job?
 "A. Well, Randy give [sic] me authorization to have it fixed and I told him to go ahead and order the panel."
Both estimates referred to above included the replacement, rather than the repair, *Page 1140 
of the damaged rear panel. The panel was in fact replaced by the Turberville Body Shop, the repair bill totaling $590.66.
After Mitchell had requested Turberville Body Shop to order the needed part, he was contacted by Carl Murray, of the Murray Adjustment Service. Murray, an insurance adjuster acting for Southern Guaranty, had inspected the truck and had taken photographs of it. Mitchell and Murray conversed about the damage, and, according to Mitchell, Murray told him that the panel could be repaired instead of being replaced. Mitchell disagreed with Murray, citing the two estimates he had turned over to Randy McDonald. Murray departed. Mitchell took the truck to the Turberville Body Shop a few days later, and the damaged panel was replaced.
About one week later, Chris Murray, another member of the Murray Adjustment Service, visited Randy McDonald at his office. At that time, Chris Murray extended Carl Murray's earlier estimate to include an amount for labor, parts, and tax, to come up with a total amount for the repairs. He deposed that he had telephoned another repairman, Billy Mims:
 "I had called Mr. Mims from Randy McDonald's office and I explained to him that I had a 1983 Chevrolet pickup with some damage to the left rear quarter. I explained to him what the damage was over the telephone and asked if he would repair the truck for the figure that I came up with. He said that he would take the estimate. I told him that I would put his name on it and mail it to him, if that was all right with him. He said that was fine and that was the end of the conversation."
Following this conversation, Chris Murray instructed Randy McDonald's secretary to mail the completed estimate form and a Southern Guaranty draft in the amount of $145.30 ($245.30 for repairs less the $100.00 deductible) to Mims in payment for the loss. The secretary, however, contrary to Murray's directions, mailed both the estimate form and the draft to Mitchell. Apparently this draft had been issued by Carl Murray, who had draft authority from Southern Guaranty, but who had not contacted the company about its amount.
After plaintiff Mitchell received the draft and estimate by mail, he telephoned Mims to inquire about it. Mims denied any knowledge of the matter.
Ultimately, plaintiff initiated this action against Southern Guaranty, Carl Murray, and Chris Murray, alleging fraud and other causes of action against them. The trial court granted summary judgment for the defendants on the basis of the pleadings and depositions of plaintiff, the Murrays, and Mims. This appeal followed.
At the outset, we note that on appeal plaintiff briefs and argues only the issue of fraud, without addressing the propriety of the summary judgment as to other alleged causes of action. When the appealing party fails to invite the appellate court's review of issues raised below, the trial court's judgment as to those issues is due to be affirmed. A.R.A.P., Rule 28 (a)(3); Mitchell v. State, 450 So.2d 140 (Ala.Civ.App. 1984); Wilger v. James, 431 So.2d 1166 (Ala. 1983).
Plaintiff's fraud count is based upon Code of 1975, §6-5-101:
 "Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud."
In rendering summary judgment against Mitchell in favor of Southern Guaranty, the trial court expressly found that "there was not the necessary element of reliance on behalf of the plaintiff."
We respectfully disagree with that conclusion from the evidence. Indeed, the evidence on the element of reliance presents a jury question. According to Mitchell, he stated to the insurance agent, Randy McDonald: "I'm getting my truck fixed and if you can collect for me, that is fine and good." And, Mitchell stated further: "[Randy] told me to go ahead and get my truck fixed." It is unclear from this *Page 1141 
verbal exchange just what Mitchell intended. Was he relying on his own initiative in effecting the repairs, or was he, in so many words, saying he was expecting the company to pay for them and collect over from the alleged person responsible for the damage? Was he acting in reliance upon McDonald's statement in response? Was that statement an authorization for repairs, or merely an acquiescence in Mitchell's statement? The interpretation of this verbal exchange, as well as Mitchell's actions in response thereto, was for the jury on the question of Mitchell's reliance. International Resorts, Inc. v. Lambert,350 So.2d 391 (Ala. 1977). Indeed, if McDonald's representation was a material inducement to his effecting the repairs at that time, and in the manner shown above, the reliance necessary would have been established.
Defendant Southern Guaranty argues that this case is controlled on the reliance issue by Earnest v. Pritchett-Moore,Inc., 401 So.2d 752 (Ala. 1981). The distinction between the cases, however, is found in the fact that in Earnest the plaintiff established that in any event he effected the repairs to his vehicle for reasons totally unconnected with anything the insurance agent represented to him, thus negating a finding that any conversation he had with his insurance agent was an inducing factor. As we have shown, such is not the case here.
The other elements of an action of fraud are (1) a false representation (2) concerning a material existing fact and (3) damage as a proximate result. Lambert, supra.
Was there some evidence of a false representation? The evidence discloses that Randy McDonald, having the two estimates given to him by Mitchell, stated that Mitchell should go ahead with the repairs. Each of the estimates called for replacement of the damaged rear panel, yet the Southern Guaranty agent refused to pay Mitchell for the panel replacement, causing him to pay the difference between the Murray estimate of $145.30 and the $590.66 repair bill under the Turberville Body Shop estimate. Although Southern Guaranty attempted to pay Mitchell the difference after he had paid the repair bill and retained counsel, nevertheless, a jury could infer from the facts that Southern Guaranty, through its agent, did not intend to pay Mitchell under the estimates when McDonald's statement was made.
The element of damage is established by the fact that Mitchell did pay the difference in the two estimates.
Insofar as any fraud claim against Carl or Chris Murray is concerned, we note that no evidence exists of any reliance by Mitchell upon any representation, if any existed, made to him by them. Plaintiff's truck had already been repaired with a replacement panel and returned to him when Chris Murray directed that the draft be sent to plaintiff. Therefore, any fraud claim against the Murrays must fail.
We find that under the evidence before the trial court on the motion for summary judgment, inferences establishing the elements of a claim of fraud under § 6-5-101 against Southern Guaranty could be drawn by a jury. Accordingly, the judgment as to Southern Guaranty must be reversed and the cause remanded for further proceedings on the fraud issue as to that defendant, and the judgment in favor of Carl Murray and Chris Murray is to be affirmed. It is so ordered.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
TORBERT, C.J., and FAULKNER, ALMON and SHORES, JJ., concur. *Page 1142